LULU B. KIDD, Appellant, v. PURITANA CEREAL FOOD COMPANY, Respondent.

St. Louis Court of Appeals, November 16, 1909.

1. **CORPORATIONS: Preferred Stockholders: Right to Dividends.** The general rule of the law is, that holders of preferred shares in a corporation are no more entitled to dividends, unless the earnings justify the directors to declare and pay them, than are the holders of common shares, for dividends are payable out of surplus earnings only.

2. ————: ————: **Rights of.** Usually the holders of preference shares are stockholders, and the principal privilege they enjoy is priority of claim to dividends, as against common stockholders.

3. ——: ——: ——: **Legislative Authority to Enlarge Rights Essential.** Without authority from the Legislature, a corporation may not confer on holders of preferred shares a right to be paid dividends, if its capital will thereby be impaired or the demands of its creditors postponed.

4. ——: ——: **"Dividends" or "Interest:" Statutes: Construction.** Merely denominating shares "preferred stock" in a legislative act does not *per se* define the rights and character of the holder of such shares, which depend on the essential qualities of the transactions authorized by the statute; and the circumstance that the installments to be paid on the shares are called "interest" in the statute, instead of "dividends," is not conclusive of the question whether such installments are in fact dividends or interest, although the name employed by the legislature to designate the shares is one badge of the legal character to be given them, as the words of a statute are to be taken in their ordinary sense, unless a different one is called for in the context.

5. **DEBT: Essence of.** The essence of a "debt" is a legal liability on the part of one person to pay money to another at some time, which liability is enforceable by a judicial action.

6. **CORPORATIONS: Preferred Stockholders: Preferring Dividends to Creditors' Claims: Legislative Authority Essential.** A corporation may bind itself to pay interest, instead of dividends, on stock; but its power to bind itself to pay installments of either kind in priority to demands of creditors must be found in a clear legislative grant.

7. ——: ——: **Guaranty of Dividends: Effect of.** A guaranty of dividends by a corporation, pursuant to statutory authority, does not make the dividends a debt, and payable absolutely; but such guaranty binds the corporation to pay such dividends out of the net earnings, whether the guaranteed payments are called dividends or interest.

8. ——: ——: **Denying Right to Vote: Effect of.** The denying of a holder of preferred shares in a corporation the right to vote does not *ipso facto* deprive him of the status of a stockholder.

9. ——: ——: **Indiana Statute: Stockholder or Creditor: Case Stated.** Burns' Ann. St. Ind. 1901, Sections 5064-5066, authorizes corporations to issue preferred stock. Section 5067 provides that such stock shall not exceed double the amount of the common stock, and shall be redeemable at par as expressed in the certificates, and that the holders of such stock shall be entitled to such semi-annual dividend as may be expressed in the

certificates, not exceeding four per cent., before any dividend shall be set aside or paid on the common stock; that the preferred stockholders, shall not be personally. liable for the debts of the company, but in case of insolvency or dissolution the debts or other liabilities shall be paid in preference to such stock, but that such stock shall have priority out of the assets of the company over common stock, for the full face value, with all arrears of interest or dividends. Section 5068 provides that preferred stock shall not be voted, and the holder shall have no voice in the management of the corporation, but that the company may not convey its real estate or mortgage any of its property without the written consent of a majority of the preferred stock, nor without such consent, declare any dividend on its common stock that will impair its capital. A corporation organized under the provisions of said statutes issued certificates to holders of preferred shares, which gave it the option to redeem the same in whole or part at any dividend-paying time before the twentieth and after the tenth semi-annual dividend had been paid, and which bound it to pay a semi-annual dividend of three per cent. In an action at law by a holder of such preferred shares to recover three semi-annual dividends, which had not been declared by the board of directors, *held*, plaintiff was a preferred shareholder and not a creditor of the defendant corporation, and her right to dividends depended on whether the earnings of the corporation justified the directors in paying them.

10. ——: ——: **Equity: Compelling Declaration of Dividends: Action at Law Does Not Lie.** Where it is clear a dividend ought to have been declared on preferred shares, a court of equity may, in a proper suit, compel this to be done, or treat it as having been done; but a dividend 'cannot be recovered in a legal action until it has been declared.

Appeal from St. Louis City Circuit Court.—*Hon. Virgil Rule*, Judge.

AFFIRMED.

*Morrow & Kelley* for appellant.

(1) Under this contract, on the face of the stock, and the Indiana statute, this certificate of stock is an interest-bearing debenture of the company, redeemable by it, and the agreement to pay interest or dividends creates an absolute debt, payable whether anything is earned by this company or not, or whether any dividends are declared by the directors. 10 Cyc., p. 574;

Williams v. Parker, 136 Mass. 204; Burt v. Battle, 31 Ohio St. 116; Savannah v. Silverburg, 108 Ga. 281. (2) An action at law is the remedy. 10 Cyc., p. 576; Savannah v. Silverburg, 108 Ga. 281; Bates v. Railroad, 49 Me. 491. It is only where the directors have a discretion as to whether a dividend shall be paid, that it is necessary to have them first declare it before suit at law. 10 Cyc. 576.

*Walton & Raithel* for respondent.

(1) The weight of authority holds that although a corporation may agree to pay interest on certificates of stock, such interest cannot be paid except out of the surplus profits legally applicable to the payment of same, and without injuring its capital stock. This is true whether the agreed payments be called "dividends" or "interests" and whether they be guaranteed or simply promised. Bingham v. Trust Co., 27 Ind. App. Ct. Rep. 245; Taft v. Railroad, 8 R. I. 310; Lockhart v. Van Alstyne, 31 Mich. 76; Field v. Roanoke Inv. Co., 123 Mo. 603; Shields v. Hobart, 172 Mo. 491; Clark & Marshall, on Corp. (2 Ed.), p. 353; Morawetz on Priv. Corp. (3 Ed.), sec. 458; Taylor on Priv. Corp. (3 Ed.), sec. 564; Beach on Priv. Corp., sec. 503. An agreement to pay dividends or interest to shareholders of a corporation without reference to the ability of the company to pay the same out of profits or the net increase is, therefore, wholly unauthorized, and it would be contrary to fundamental principles to allow the capital of the corporation to be reduced by distribution among the shareholders in any form. Railroad v. King, 17 Ohio St. 534; Railroad v. Tibbits, 18 Barb. 297; Railroad v. County of Allegheny, 63 Pa. St. 126; Railroad v. United States, 99 U. S. 402; Beach on Priv. Corp. vol. 2, sec. 505; St. John v. Railroad, 22 Wall. 136; Field on Corp., sec. 104, and cases cited. Even an expressed guaranty to pay a certain dividend on preferred stock entitles the holder to dividends only

when there are profits out of which they can be paid. A contract to pay dividends on preferred stock, at all events, whether any profits are made or not, would be contrary to public policy and void. Miller v. Rotterman, 47 Ohio St. 141; Field on Corp., sec. 121; Lockhart v. Van Alstyne, 31 Mich. 76; Curran v. Arkansas, 15 How. 304. (2) Equity affords appellant the relief sought, if entitled to any redress at all, for the reason that an action at law cannot be maintained against a corporation by a stockholder for a dividend as for a debt due, until the dividend has been declared. The proper remedy of the stockholder is a bill in equity to compel the board of directors to declare the dividend providing the directors have wrongfully refused to declare the dividend, thus leaving it to the discretion of the directors unless fraud can be shown. Clark on Corp., p. 340, cited with approval in Bingham v. Marion Trust Co., 27 Ind., supra; Miller v. Rotterman, supra; Beach on Corp., vol. 2, sec. 506; Beach on Priv. Corp., vol. 2, sec. 602; Clark and Marshall on Priv. Corp., sec. 529 (c), p. 1741. Dividends upon preferred stock are not a debt that is guaranteed, but constitute the right to a dividend from the earnings and income of the corporation. A right to a dividend is not a debt. There is no debt until a dividend is declared. The obligation and right to declare it does not arise until there is a fund from which it can properly be made. Therefore, preferred shareholders are not creditors. Beach on Priv. Corp., vol. 2, sec. 505; 10 Cyc., p. 576, sub. sec. B and 10 Cyc., p. 577, sub. sec. B.

This is an action at law to recover three semi-annual dividends of three per cent each, alleged to have been due in September of 1906 and March and September of 1907, on certificate of stock No. 5, of the preferred stock of the Puritana Cereal Food Company,

which certificate represented five hundred shares of the preferred stock of said company, sold and delivered to plaintiff by the company on May 12, 1904. The company was incorporated under the laws of Indiana, and from the face of the certificate it appears preferred and non-assessable shares of one dollar each could be issued to the amount of thirty thousand. The material parts of the certificate are as follows:

"This certificate represents the number of shares herein above stated, of the Preferred Capital Stock of the Puritana Cereal Food Company, redeemable in whole or in part at the will of said company, at par, at any dividend-paying time before the twentieth and after the tenth semi-annual dividend has been paid, and said company binds itself to pay a three per cent semi-annual dividend hereon."

The articles of incorporation of the company were introduced and show its purpose was to manufacture and sell Puritana Mush and other similar food products where profitable sales could be made, and purchase, hold and sell letters patent and grants of licenses under them on all articles manufactured and sold by defendant. The capital stock was limited to $70,000 common and, as said, $30,000 preferred, of which only $5500 had been issued. Plaintiff put in evidence seven sections of volume 2 of Burns Annotated Statutes of Indiana of the Revision of 1901, to-wit, sections 5064 to 5070, inclusive. The sections of the Indiana statutes to which we are referred read as follows:

"Sec. 5064. Preferred Stock.—That any manufacturing, mining or other company having a capital stock, which has been or which may hereafter be organized or incorporated under the law of this State, shall have power to create and issue shares of preferred stock in such company of not more than one hundred dollars ($100) each, the aggregate amount of which shall at no time exceed double the amount of the common stock of such company.

"Sec. 5065.    Provisions in Articles of Association. —At the time any such company is organized and incorporated, the incorporators thereof may in their certificate or articles of association provide for the issuance of such preferred stock by such company by stating the amount of preferred stock proposed to be issued and the number of shares into which it is to be divided, and when so provided for in said certificate or articles of association, said company shall be duly authorized and have full power to create and issue certificates for shares of such preferred stock.

"Sec. 5066.    Issuing of Preferred Stock.—Any such company already organized desiring to create and issue shares of preferred stock in such company may do so at any annual, regular or special meeting of its stock-. holders, by the vote of the holders of three-fourths of its common stock, and such company may at any such meeting or any subsequent meeting of its stockholders, by a vote of the holders of a majority of its common stock, authorize and empower its board of directors to dispose of and issue such preferred stock upon such terms and conditions as said board of directors may deem best, or such company may prescribe; and when so authorized the validity of the issuance and the disposition made of such preferred stock by said directors shall in all things be binding and conclusive upon such company.    Within thirty days after the time such company has authorized the issuance of preferred stock as provided in this section, it shall cause to be filed with the Secretary of State its certificate in writing, signed by its president and attested by its secretary, duly acknowledged, certifying that the issuance of preferred stock has been authorized by such company, the amount of such preferred stock, the number of shares into which it shall be divided, and the amount of each.

"Sec. 5067.    Amount of Limit.—Such preferred stock shall not at any time exceed double the amount of the common stock of such company actually sub-

scribed or issued, and it shall be subject to redemption at par at such time or times, and upon such terms and conditions as shall be expressed in the certificates thereof, and the holders of such preferred stock shall be entitled to receive, and said company shall be bound to pay thereon, such semi-annual sum or dividend as may be expressed in the certificates, not exceeding four per centum, before any dividend shall be set aside or paid on the common stock of such company, and in no event shall the holders of such preferred stock be individually or personally liable for the debts or other liabilities of such company, but in case of insolvency or upon the dissolution of such company, such debts, or other liabilities shall be paid in preference to such preferred stock. Such preferred stock, however, shall at all times have priority in payment out of the assets of such company over the common stock thereof, for the full face value, together with all arrearages of interest or dividends due thereon.

"Sec. 5068. Stock not to be Voted.—Such preferred stock shall not be voted at any meeting of such company, nor shall the holders thereof, as such, have any voice in the management of the affairs of such company, excepting, however, that such company shall not have authority to convey its real estate or mortgage any of its property without the written consent of the holders of a majority of the shares of such preferred stock; nor shall such company without such consent, declare any dividend upon its common stock that will impair its capital. Such preferred stock shall not entitle the holder thereof to any interest in the assets of such company beyond the par face value of such preferred stock, together with all arrearages of interest or dividends due thereon.

"Sec. 5069. Redemption of Stock—Certificate.— When any such company has redeemed the preferred stock issued by it under the provision of this act, its directors shall within thirty days thereafter cause to

be filed with the Secretary of State their certificate in writing, as directors of such company, duly acknowledged, certifying that such preferred stock has been redeemed; and in default thereof, the directors of such company shall be jointly and severally liable for all debts and liabilities of such company contracted after said thirty days and before such certificate is filed."

Two dividends have been declared and paid on the outstanding preferred shares, one in March, 1905, of eight per cent, and the second in March, 1906, of six per cent. The sum of $316 would be a six per cent dividend on the shares issued, and the secretary of the company said that in March, 1906, the company had a balance of $1200 after paying this dividend; that the company had not been able to declare dividends at the semi-annual periods falling due in September of each year, because the sale of Puritana Mush ends with the cold season about the middle of April, and from then on it is the custom to close down the factories operated by defendant until the cold weather commences in the following fall; hence there were no earnings after March, and there were rentals to be paid while the factories were closed down. He testified further when the dividend period arrived in March, 1907, the company had in bank $1300, but it was the desire of the directors to develop the business along collateral lines so as to continue operating the factories during the warm weather, and hence they thought it better not to pay any dividend on the preferred stock. His testimony regarding the various items of expense and disbursement of the company during the spring and summer of 1907, was as follows:

"Since March, 1907, this defendant company, through its directors, has purchased an oven for the St. Louis Plant, paying therefor the sum of $150, which oven is for the baking of cookies and other goods such as are now being sold, and which it is believed will continue to command a sale during the warm weather

when the Puritana Mush will not be salable. In addition it has improved its machinery for cleaning and grinding horseradish, and for the cleaning and preparing of potatoes for potato chips now being sold at St. Louis, the cost of which improvements is in the neighborhood of $100. In addition to this expenditure the company has been forced into expensive litigation brought in Marion county, Indiana, in May, 1907, for the appointment of a receiver for the defendant company, which suit for receiver was brought by Lulu B. Kidd, who is the same person now suing the defendant in this court. After the taking of testimony for three days, beginning May 3, 1907, before Judge Leathers, of Room 2, of the Superior Court of Marion county, the petition for appointment of a receiver was refused by the court. Since March, 1907, this defendant company suffered a loss from fire at its St. Louis factory in the sum of about $200. In January, 1906, this defendant company started the manufacture and sale of Puritana Mush in the city of Chicago, Ill., and owing to the necessity of advertising its goods, the business was conducted at expense without any immediate profit. The factory was closed in the following spring of 1906, and reopened late in the fall of 1906, the two wagons and factory equipment and supplies being stored in a building on which the company paid a rental of $12 a month. The Chicago factory continued in operation until about April, 1907. The season of 1906-1907 incurred an expenditure of $225 over and above receipts. The company's business at Chicago has at no time been conducted at a profit, and was not expected by the company to be profitable until the product had been introduced and become known to the consumer. The working capital of this company has not been and is not now sufficient to enable it to expend large sums in advertising, which is necessary to put a new product upon an immediate paying basis. The receipts at Chicago have been encouraging and satisfactory to the de-

fendant company, and the factory is expected to be self-sustaining in the present season. The results further indicate that when the product has become known to the consumers in Chicago, that the profits will be proportionately larger than in cities further south, on account of the longer seasons within which mush is consumed. . . . It is hoped and believed, however, that the policy of the company in extending its business to Chicago, and in adding horseradish, potato chips, cookies, cakes and popcorn, that it will be able to extend its seasons so as to continue in operation throughout the entire year, and thereby be able to pay dividends at both semi-annual periods on the common as well as the preferred stock."

A balance sheet prepared by the secretary of the company showed a balance on hand of $325.67, on March 3, 1906, after the payment of all running expenses and dividends. Plaintiff introduced in evidence a letter of the secretary dated March 7, 1907, addressed to her, in which he said that because of the unusually open winter, the season had not been favorable to the sale of defendant's products; that the directors had long felt some effort should be made to keep the factories running throughout the year instead of closing down during the warm months; that arranging to do this was entailing expenditures, and while the profits of the season would justify the payment of a six per cent dividend on the preferred stock, it had been decided to be wise not to pay out a dividend, "in order to make our new enterprise a success." The new enterprise apparently referred to a package of potato chips defendant had put on the market, the construction of an oven to enable defendant to bake cookies, and the extension of its Chicago business. The general manager of the company testified there were no profits in September, 1906, as during the summer defendant was disbursing everything and taking in nothing. The court gave judgment for defendant and plaintiff appealed.

GOODE, J. (after stating the facts).—The relation of plaintiff to defendant company is argued by her counsel to have been that of creditor, instead of shareholder, and, therefore, they contend defendant was bound in every contingency, to pay the dividends semiannually as stipulated and whether its net earnings warrated a declaration of dividends, or even if its capital would have been impaired by paying them. The general rule of law is that holders of preference shares in a corporation are no more entitled to dividends, unless the earnings of the company justify the directors to declare and pay them, than are the holders of common shares; for dividends are payable only out of surplus earnings. [2 Clark & Marshall, Priv. Corp., sec. 529c and cases cited in note 226; Purdy's Beach, Priv. Corp., sec. 476; Chaffee v. Railroad, 16 Am. and Eng. R. R. Cas. 408; In re London, etc., Co. L. R. 5 Eq. 525.] Usually the holders of preference shares are stockholders of the company, subject to the rights and liabilities attaching to that relation, and the principal privilege they enjoy is priority of claim to dividends as against the holders of common shares; which priority is the prominent characteristic of preferred stock. [Kent v. Mining Co., 78 N. Y. 159.] Without authority from the Legislature, an incorporated company cannot confer on holders of preferred shares a right to be paid dividends, if the capital of the company will thereby be impaired or the demands of its creditors postponed. [Hamlin v. Trust Co., 78 Fed. 664; 2 Clark & Marshall, sec. 417c; Purdy's Beach, sec. 476.] Instead of the issuance of preferred stock necessarily creating a debt, a standard treatise says such a transaction "is a mode by which a corporation obtains funds for its enterprises *without borrowing money or contracting a debt.* Its holders (*i. e.* the holders of preferred stock) are a privileged class who are entitled to dividends of a certain per cent *out of*

*the net earnings* in priority to any dividends upon ordinary stock." [Pierce, Railroad Law, 124.] (Italics ours.) But statutes have been enacted in language which was construed to invest a corporation with power to issue preference shares upon terms that made the holders of them not stockholders of the company, but its creditors, and entitled to payment of so-called dividends regardless of whether the earnings of the company sufficed to meet them or not, and entitled also to payment of the face value of the certificates by a certain date. Cases in which it was contended a person, nominally the holder of preference shares, in reality occupied the status of a creditor and should enjoy greater rights as such than he would as a stockholder have engaged the attention of the courts often enough for the principles upon which the point is to be determined to become settled; though, perhaps, not all the results reached nor all the remarks contained in opinions can be reconciled. The task of the court in such a controversy is one of interpretation; to determine whether the essential nature of the agreement between the apparent shareholder and the company makes the former a stockholder or a creditor; and the answer to this question always depends on the language of the statute which authorized the company to issue preferred shares, as well as on the language employed in the certificates of shares. It has followed that while the same principles of interpretation are adopted by all the courts, the conclusions reached in the cases differ, because the statutes differ under which the various companies sued had issued preferred certificates, or what were such in form. The Supreme Court of Georgia said, in dealing with a similar controversy, the question whether the holder of a certificate issued by a corporation is a member of the corporation, or the certificate is simply evidence of a debt due by the corporation to the holder, is one depending on the peculiar facts of each case; and therefore the decisions relating

to the questions are only helpful in so far as they lay down general principles to guide in the determination of any case that may be for consideration. [Savannah Co. v. Silverburg, 108 Ga. 281, 288.] Nominal stockholders have been treated as actual creditors on several grounds. In some instances the statute involved obviously was enacted simply to empower the company to put out preferred shares and secure them by a lien on its assets, as an alternative mode of borrowing money in lieu of issuing bonds secured by a mortgage on the assets, as the company might have done. [Burt v. Rattle, 31 Oh. St. 116; Heller v. Bank, 43 Atl. (Md.) 800.] In the first of those cases the statute entitled the holders of preference shares not only to have their demands secured by a mortgage on the assets of the company, but authorized the company to guarantee semi-annual dividends and full payment of the face value of the stock by a certain date, denied the holders the right to participate in the affairs of the company by voting, excluded them from either the profits or the losses of the business, and exempted them from liability to creditors of the company. It is plain those attributes, particularly enjoyment of immunity from any losses of the business and the right to be paid back the amount invested by a certain date, were germane to a loan rather than to a subscription for stock. For the same and other even more cogent facts tending to show the preferred stock was in truth simply a loan made by the company in that form, the judgment in Heller v. Bank treated the nominal stockholder as a creditor. In Savannah Co. v. Silverberg, supra, the decision that the nominal shareholder was in fact a creditor, was rested principally upon the binding obligation of the company to redeem the preferred shares by a given date and the circumstances of embarrassment under which they were issued. It is to be noted, however, that while the court held he was a creditor, it said the dividends

to which the certificate said he was entitled semi-annually, though really interest, were not meant "to be paid absolutely and at all events, but simply in the event the corporation earned a sufficient amount to pay each holder of such certificate;" a singular remark. The question in that case was whether the holder could collect the full value of the certificate when it matured, and the court decided he could. In another case to which we have been cited, and the one mainly relied on by plaintiff, the statute was held on grounds not clear to our minds, to have been enacted to enable the company to borrow money for the discharge of debts, by issuing preferred stock, and hence the holder of such stock was treated as a creditor and not as a stockholder. [Williams v. Parker, 136 Mass. 204.] An attempt to distinguish the statute on which that decision was given from the one on which Field v. Lamson, 166 Mass. 388, was determined, was attempted in the opinion in the latter case, wherein the preferred shares were treated as stock and not as an evidence of debt. The distinction was put on the ground that the statute involved in Field v. Lamson required the dividends to be paid out of the net earnings—an important distinction if properly drawn; but the like requirement might have been implied in the earlier case; and, indeed, has been implied on a statute using similar language, as will appear from an excerpt *infra* from the opinion in Elkins v. Railroad, 36 N. J. Eq. 233. Before scrutinizing the Indiana statute, it may be well to say merely denominating shares "preferred stock" in a legislative act, does not *per se,* define the rights and character of the holder of such shares, which depend on the essential qualities of the transaction authorized by the statute. [Elkins v. Railroad, Burt v. Rattle, supra; Miller v. Ratterman, 47 Oh. St. 141.] And the circumstance that the installments to be paid on the shares annually or semi-annually, were called "interest" in the statute instead of "dividends," or that the two terms

were used interchangeably, is not regarded as conclusive of the question of whether the installments are in fact dividends or interest. [Williston v. Railroad, 95 Mass. 400; State v. Railroad, 16 S. C. 524; Sturge v. Railroad, 31 Eng. Law & Eq. Rep. 406; Corry v. Railroad, 29 Beav. 263.] Nevertheless, the name employed by the Legislature to designate the shares, is one badge of the legal character intended to be given to them, for the words of a statute are to be taken in their ordinary sense unless a different one is called for by the context. [R. S. 1899, sec. 4160.] The court applied this rule of interpretation in dealing with the very question before us, in State v. Railroad, 16 S. C. 524; and in determining whether or not shares were stock or an evidence of debt, attached weight to the fact that the Legislature had called the shares "preferred stock." Whatever influence the name employed in the Indiana statute to designate these shares should have in determining whether the certificate was one for stock or an evidence of debt, favors the former character. But there are weightier reasons for holding it stock. An examination of the statute and of the certificate itself, makes it apparent that by no semblance of reason could we hold defendant became indebted to plaintiff for the face value of the shares; that is to say, $500. This is so because defendant did not bind itself to pay the face value of the shares to plaintiff at any time, but only reserved an option to pay at its pleasure after ten semi-annual dividends had been paid and before the twentieth matured. The essence of a debt is a legal liability on the part of one person to pay money to another at some time, which liability is enforcible by a judicial action. [Lockhart v. Van Alstyne, 31 Mich. 76, 78.] The only plausible contention for plaintiff is that the obligation to pay semi-annual dividends at maturity was absolute and created a debt; that the so-called dividends were not technically such, but installments of interest the company was bound to pay whatever befell.

A company may bind itself to pay interest instead of dividends on stock, but its power to bind itself to pay installments of either kind in priority to the demands of creditors, must be found in a clear legislative grant. [1 Cook, Corp. (6 Ed.), sec. 277; City of Covington v. Covington, etc., Bridge Co., 10 Bush. (Ky.) 69.] It is unusual and anomalous for companies to bind themselves absolutely to pay installments periodically on shares, instead of as dividends are earned; and we think this company ought not to be held to have agreed to do that unless, upon a fair interpretation of the statute and contract, the conclusion that the installments were payable absolutely must be deduced. We regret the necessity of expounding the statute of another State unaided by an interpretation by its courts of last resort; and it is with diffidence we announce our opinion that the Legislature of Indiana did not intend to make the simi-annual installments accruing on preferred shares of stock in a manufacturing company interest and a debt, any more than it intended to make the principal of the shares a debt; and this was not intended to be a debt necessarily, because the statute does not declare a company's liability for the principal shall have a date of maturity in favor of the holder, but makes it subject to redemption upon such terms as the certificate shall provide (sec. 5067). The certificate under review provided for redemption at the pleasure of the company after ten dividends had been paid and before the twentieth fell due; and this reservation of an option to redeem is consistent with the statute. No provision regarding the installments can be found in the several sections of the statute, which tends to fasten on them the character of a debt in a way peculiar and distinctive, in comparison with the character the statute gives to the principal of the shares, except the fixed dates of maturity of the installments. As to this matter the certificate issued by the company obligates it to pay a semi-annual dividend of three per cent. But the

statutory language is not imperative, and only binds a company which issues preferred shares to pay a dividend on them before setting aside anything for the common stock; that is, does not compel payment at stated intervals whatever happens.    The circumstance that installments have a maturity date cannot alone be regarded as conclusive in favor of their being absolute obligations, or else all dividends stipulated to be paid at definite intervals would be payable without regard to a company's earnings; a conclusion opposed to the adjudicated cases.    In our judgment the meaning of the statute is that the installments partake of the nature of the principal, and if the latter is stock, they are dividends on stock and affected by the common incidents of dividends; that is, they will be postponed to debts and are declarable in the discretion of the directors, exercised in good faith.    Besides the decisive reason already advanced against regarding the principal as a debt, that no time is fixed in which it shall fall due, other reasons may be invoked.    The Indiana statute does not authorize companies to issue preferred shares merely as a mode of borrowing money and only in the contingency of a necessity to borrow; no authority is given a company to secure preferred shares by mortgage or other lien on its property, as was the case in Heller v. Bank, 43 Atl. 800, and Burt v. Rattle, supra.    Moreover, the statute authorizes the issue of preferred shares in double the amount of the common stock of the company, and it is improbable the Legislature meant to empower companies to borrow twice as much as their capital.    But this would be the effect of construing the act to make preferred shares a debt instead of part of the capital stock of a company.    All issues of preferred stock must be reported to the Secretary of State with particulars, and the shares of such stock are subject to redemption at whatever time shall be provided in the certificate, but, as already said, need not be redeemed at any time unless the company agrees they

shall be. As pointed out supra, section 5067 does not bind a company to pay semi-annual dividends on preferred shares, but says it shall be bound to pay dividends in the sums expressed in the certificate, not exceeding four per cent, before any dividends shall be set aside or paid on the common stock. We take that language to mean the dividends shall be paid out of the surplus earnings and after creditors have been satisfied, but before dividends are declared or paid on common stock. The section goes further and says in case of insolvency or dissolution of the company, its debts and other liabilities shall be paid in preference to preferred stock. This language makes the preference shares participate in business losses; whereas the last clause of section 5068 prevents them from participating in profits beyond interest or dividends, and says, in effect, they may take out of the assets of the company only their face value and arrearages of dividends or interest.

The most important inquiries in cases like this relate, firstly, to whether a date is fixed within which a company is bound to pay the preferred shares, for all true debts must fall due some time, and, secondly, to whether such shares are subject to losses of the business in the sense that the holders of them are postponed to creditors at large in case the company becomes insolvent, for such postponement is not easily reconcilable with the notion that the holders of what are nominally preference shares are in reality creditors. The proviso in section 5067, that preferred stock shall at all times have priority of payment out of the assets of the company for their full face value, together with all arrearages and interest thereon, over the common stock, appears to emphasize the only priority accorded to preferred shares; and the language of the section as a whole imports that other liabilities and debts of a company shall take precedence in payment over interest and dividends on preferred stock. Similar language was treated in Elkins v. Railroad, 36 N. J. Eq. 236, as equiv-

alent to expressly declaring dividends on preference shares should be paid out of net earnings, and as entitling the holder of those shares to payment of arrearages of dividends which had accrued in back years, before common stockholders could share in the profits; but not to entitle him to payment absolutely and without regard to earnings. The statute there involved was, at this point, like the one before us and reads:

"That when so issued and declared to be preferred stock, the holders thereof respectively shall be entitled to receive dividends on the same not to exceed seven per centum per annum, before any dividend shall be set apart or paid on the other and ordinary stock of said company." Loc. cit. 235.

The portion of the Indiana statute which at first glance looks most favorable to plaintiff, is the one forbidding the company to mortgage any of its property without the written consent of the holders of a majority of the preferred stock. Section 5068. One might think this proviso useless unless the preferred shares are intended to enjoy priority of payment over debts. But section 5067 expressly gives debts and liabilities the priority. This proviso about mortgages is an incongruous one, and when narrowly observed, rather clashes in its own terms with the idea that preferred shares are to have absolute priority; for the assets may be mortgaged with the consent of a majority of the preferred shares against the will of the minority. Just what the purpose of the proviso was is difficult to say, but we suppose the Legislature apprehended preferred stock might suffer some detriment from a mortgage it would not suffer by merely postponing it to unsecured debts if the company became insolvent.

The gist of the argument for plaintiff is this: The statute authorized the company to guaranty payment of dividends on preferred shares and deprived the holder of those shares of the right to vote; two facts which demonstrate the Legislature intended to make

the holder a creditor of the company. The statute nowhere clearly empowers the company to guaranty the dividends; but granting this power may be deduced, the reasoning for plaintiff would compel the untenable conclusion that the principal as well as the interest on the shares is a debt. Moreover, a guaranty of dividends by a company pursuant to statutory authority does not make the dividends a debt and payable absolutely. [Taft v. Railroad, 8 R. I. 310; Chaffee v. Railroad, supra; Lockhart v. Van Alstyne, 31 Mich. 76; Miller v. Ratterman, 47 Oh. St. 141; Field v. Lamson, 162 Mass. 308; Ulverstone, etc., R. R. v. Commr's, 2 Hurlst. & C. 855.] And neither does denying the holder of preferred shares a vote, *ipso facto*, deprive him of the status of stockholder. [2 Thompson, Corp. 2281; Savannah Co. v. Silverberg, 108 Ga. 281, 287.] According to the general doctrine, a guaranty to pay dividends means the company binds itself to pay them out of such assets as are legally available for that purpose, that is, net earnings; and this is true whether the guaranteed payments are called dividends or interest. [1 Morawetz, Priv. Corp. 457; quoted and followed in Field v. Investment Co., 123 Mo. 603, 620.] The reasoning and authorities supra lead to the conclusion that plaintiff was a preferred shareholder and not a creditor of defendant, and her right to dividends depended on whether the earnings of the company justified the directors in paying them. The undisputed evidence shows the earnings were not sufficient to pay more than one dividend a year.

Perhaps the inference might be drawn that one dividend could have been declared in 1907, had not the directors thought best to extend the business.

Where it is clear a dividend ought to have been declared on preferred shares, a court of equity in a proper suit may compel this to be done or treat it as having been done. [Boardman v. Railroad, 88 N. Y. 157, 180.] But the present action is one at law, and

certainly a dividend cannot be recovered in a legal action until it has been declared. [2 Clark & Marshall, sec. 517b, and cases cited in note 9.]

The judgment is affirmed. All concur.