(No. 22090.—

THOMAS R. TENNANT, Appellant, *vs.* HARRY EPSTEIN *et al.* Appellees.

*Opinion filed February 23, 1934—Rehearing denied April 6, 1934.*

PAUL MACGUFFIN, and KIRKLAND, FLEMING, GREEN & MARTIN, (HOWARD ELLIS, J. FRED REEVE, and J. B. MARTINEAU, JR., of counsel,) for appellant.

WALTER BACHRACH, and HALL & HULSE, (ARTHUR MAGID, of counsel,) for appellees.

Mr. JUSTICE FARTHING delivered the opinion of the court:

This cause comes here from the Appellate Court for the Second District by appeal and certificate of importance. That court reversed a decree of the circuit court of Lake county without remanding the cause.

The appellant, Thomas R. Tennant, filed a bill in equity in July, 1929, in the Lake county circuit court, against the appellees, Harry Epstein, Anna Epstein, his wife, Chester H. Epstein, their son, and the Grayslake Gelatine Company, an Illinois corporation. The bill prayed for cancellation of 32,000 shares of common stock which formed a stock dividend, for re-payment of cash dividends thereon, and, in the alternative, for relief not in question in this court. The individual parties to the suit are, and have been from its organization, the sole owners of the shares of the corporation. In 1922 the company was formed to manufacture gelatine. Earlier, on December 1, 1921, after negotiations had been carried on for a considerable period between

Harry Epstein and Tennant, they entered into a contract. This contract provided for the purchase by Epstein of a certain manufacturing plant, and that a corporation was to be formed with 1500 shares of preferred stock, with the same preferential rights and interests later provided for in the articles of incorporation. The contract provided that the board of directors, after the company had been organized, should vote a salary of $1000 per month to Harry Epstein as president, and that immediately after adopting by-laws the company was to enter into a contract to employ Tennant for five years as general manager and supervisor of production at a like salary. It also provided that Harry Epstein would transfer 100 shares of common stock to Tennant at the expiration of each year of this contract. Tennant was to put in $10,000 for 100 shares of preferred stock. The Epsteins were to get the remaining 1400 shares of preferred stock and 2000 shares of common stock.

On March 20, 1922, Epstein's attorney, Hamilton Moses, mentioned the fact that all shares in an Illinois corporation were required to have voting power. At his suggestion 30,000 shares of preferred and 2000 shares of common stock were provided for, all of the par value of five dollars instead of what the contract required. The Epsteins received 28,000 and Tennant 2000 shares of preferred. The Epsteins first received the 2000 shares of common, and during the life of the contract with Tennant he received 500 shares of common stock as agreed. Epstein's lawyer became a witness in the case. He admitted that either Tennant or Harry Epstein in the conversation with reference to the articles of incorporation on March 20, 1922, at the office of Moses, said they were going to engage in the gelatine business, and that such matters as the kind and number of shares of stock were matters of law, about which they knew nothing. The witness Moses, among other things, said that it was stated that they (Ten-

nant and Epstein) wanted the stock issued in such a way that there would be a certain, definite amount paid by way of interest, and that Tennant had to get his money to pay interest on what he had to raise to put into the business. He stated with reference to the form of stock certificate prepared by his firm, that "as I read it, it incorporated every idea that was intended to be evidenced by the certificate of incorporation." In this connection he also said that it was his idea that the preferred stock was to get no more cash dividends than the seven per cent cumulative dividend provided for in the articles of incorporation and stock certificate. As to the change in number of shares, etc., from the provision made therefor in the contract of December 1, 1921, he said: "They [meaning the articles of incorporation] were prepared while Mr. Tennant and Mr. Epstein were there, after we had the talk in which I explained to them that I did not think they should have 1500 shares of preferred stock of the par value of $100 per share and 2000 shares of non-par stock." In reply to a question as to whether he explained to Tennant what effect the change would make on his rights as owner of twenty-five per cent of the common stock, he said: "I told him that it would not be fair to have the holders of the common stock, 2000 shares, have a greater power in the control of the company than the persons who paid in $150,000 for 1500 shares of stock. I explained to them that in Illinois you could not make a stock as to an Illinois corporation a non-voting stock. I said it would not be fair for one who had made a $10,000 investment to have greater control than those who paid $150,000." Again, he answered that they were "just discussing it from the voting standpoint," in response to a question as to whether the change did bring about a different effect and whether such effect had been pointed out to Tennant. At another place he testified that "I never thought of it," when asked whether on March 20, 1922, or prior thereto, he had con-

templated what effect the change in number of shares of the two kinds would make in the event of a stock dividend. He admitted that holders of the preferred stock were not intended to receive cash dividends beyond seven per cent per annum, payable quarterly, but stated that in his opinion stock dividends were not excluded by this limitation, and that since they were not technically "dividends," in that by a stock dividend the corporation was not divorced from the cash but merely transferred it to its capital account, holders of preferred stock would be entitled to receive stock dividends. With reference to the by-laws he said: "If you will remember the by-laws, it provided that any new stock should be distributed *pro rata*. That was the clause we put into that by-law that is a little different than any you have ever seen in by-laws before. It was incorporated in the by-law by us."

The articles of incorporation provided, with reference to stock, as follows: "The preferred stock shall be seven per cent (7%) cumulative dividend preferred, and shall be a first lien on the assets of the company, in event of its dissolution, over the common stock of said company, and shall be entitled to payment of seven per cent (7%) cumulative dividend annually before any dividend shall be declared and paid upon the common stock of the company." The by-laws provided:

"Section 1. The capital stock of this corporation shall consist of 30,000 shares of preferred capital stock, of the par value of five dollars each, and 2000 shares of common capital stock of the par value of five dollars each.

*"Preferred stock.* Sec. 2. The preferred stock shall be seven per cent cumulative dividend preferred, and shall be a first lien on the assets of the company, in the event of its dissolution, over the common stock of said company, and shall be entitled to the payment of a seven per cent cumulative dividend annually before any dividend shall be declared and paid upon the common stock of the company.

*"Increase.* Sec. 3. Should the capital stock of the company at any time be increased, such increase shall be offered to, and may be subscribed to by, the then existing shareholders in proportion to their shareholdings at that time at not less than par."

All of the stock certificates, evidencing ownership in both preferred and common stock, provided: "The holders of the capital preferred stock shall receive from the surplus or net earnings of the corporation, dividends at the rate of seven per cent (7%) per annum at the par value of such stock, and no more, payable quarterly. Such dividends shall be cumulative, and as often as any such dividends shall have accrued and remain unpaid, no dividends shall be paid to the holders of the common stock of the corporation. In the event of any liquidation, dissolution or winding up, whether voluntary or involuntary, of the corporation, the holders of the preferred stock shall be paid the par value of their shares, and all dividends accrued thereon, before any payment or distribution shall be made to the holders of the common stock."

The appellant, Tennant, testified that Harry Epstein approached him and asked him to go into the gelatine manufacturing business' with him. He stated to Epstein that he had received a similar offer from a Buffalo gelatine manufacturing company and that the offer included twenty per cent of the common stock of the company. Epstein offered a like amount, and when Tennant said that was not enough, raised it to twenty-five per cent, which Tennant still stated was not enough. Epstein asked what gelatine could be produced for, and, basing his reply on his experience with a similar company, Tennant replied forty-five cents per pound. Epstein then stated they could sell gelatine at fifty-five cents a pound, and that if they built a plant which would produce one million pounds a year, Tennant's one-fourth of the common stock would entitle him to one-fourth of the dividends, which would

be approximately twice the salary of $1000 per month offered by Epstein to Tennant. This conversation is not denied.

Harry Epstein, Anna Epstein, his wife, and Tennant were the incorporators and signed the articles of incorporation. They became the first directors of the company. Harry Epstein was president and Anna Epstein seems to have been the secretary when Tennant received his stock certificate dated March 24, 1922, and a year later Chester H. Epstein had become the secretary. Tennant was notified in 1927 that his contract would not be extended or renewed. That year he was removed from the board of directors. The company prospered. It was stipulated that on May 22, 1929, the surplus and undivided profits were $321,408.55. May 21, 1929, a resolution was adopted by the directors declaring a dividend of common stock, 32,000 shares of the par value of five dollars each, which were distributed one share to the holder of record of each share of common and preferred stock on March 21, 1929. There was transferred from the surplus to the capital account $160,000. Until later no dividends were paid on common stock, but the annual seven per cent dividend had been paid on 30,000 shares of preferred stock from 1922 to 1929. April 23, 1929, a cash dividend of forty-nine per cent, called an "equalizing dividend," was voted by the board of directors on the par value of the 2000 shares of common stock. Cash dividends were declared on all the common stock after the stock dividend.

The decree of the chancellor ordered that the resolution adopted at the meeting of the stockholders of the corporation on April 2, 1929, to increase the capital stock from $160,000, consisting of 30,000 shares of preferred and 2000 shares of common stock, to $510,000 by increasing the number of shares of common stock to 72,000, be vacated, set aside and canceled. It was also ordered that the action of the board of directors of the company taken on May 21,

1929, declaring a stock dividend of 32,000 shares of common stock to all stockholders of record, be set aside and that the stock certificates so issued be surrendered to the corporation and canceled. Tennant had voted against the increase in stock at the stockholders' meeting. Cash dividends made subsequent to the stock dividend date were ordered re-paid to the corporation. The directors were enjoined from paying more than seven per cent per annum on preferred stock and an accounting was ordered taken.

The question presented by this record is whether the holders of preferred stock in this company have a right to share in a stock dividend to be paid for out of the undivided earnings and surplus in addition to the seven per cent annual cash dividend. The preference which preferred stock enjoys over common stock as to dividends is entirely a matter of contract. The contract is generally set forth in the charter or articles of incorporation, by-laws or stock certificates. No case has been found from our own jurisdiction bearing upon the point of the right of preferred stock to share in dividends beyond the amount of preference stated. Decisions of other jurisdictions are helpful only to the extent that the language contained in the contract between the shareholders is similar to that under consideration here and if the statutes there are similar to our own. *Collins* v. *Portland Electric Power Co.* 12 Fed. (2d) 671; *Star Publishing Co.* v. *Ball,* 192 Ind. 158, 134 N. E. 285; *Stone* v. *United States Envelope Co.* 119 Me. 394, 111 Atl. 536; *Scott* v. *Baltimore and Ohio Railway Co.* 93 Md. 475, 49 Atl. 327.

It is elementary that the statute in force when the contract between the shareholders was made is a part of their contract. Where no statute exists the contract itself is all that need be looked to to determine the preferential rights of preferred stockholders. (*Williams* v. *Renshaw,* 220 N. Y. Sup. 532, 220 App. Div. 539.) At the time the contract contained in the articles of incorporation in this case

was entered into between the parties to this suit, the act in force was the act of 1919 as amended in 1921. (Smith's Stat. 1931, p. 745.) Sections 6 and 31 provide, respectively, what shall be included in the articles of incorporation and stock certificates. Paragraph 4 of section 6 provides that each corporation organized under the act shall, subject to the conditions and limitations prescribed by the act, have the following powers, rights and privileges: "To have a capital stock of such an amount, and divided into shares with a par value, or without a par value, and to divide such capital stock into such classes, with such preferences, rights, values and interests as may be provided in the articles of incorporation," etc. Section 31 provides: "Shares of stock having a par value shall be represented by certificates which shall state the number of shares represented thereby, the par value thereof, the name of the holder, the relative rights, interests and preference (if any) of such shares," etc. These provisions of the statute clearly limit the rights, preferences and interest of preferred as well as common shareholders to what is set out in the articles of incorporation and the stock certificates. In addition to statutory provisions, the rule of construction has been generally adhered to that *expressio unius est exclusio alterius*. *Stone* v. *United States Envelope Co. supra; Ramsey* v. *Steel Co. of Canada,* 4 D. L. R. (Ont.) 879; *Lyman* v. *Southern Railway Co.* 149 Va. 274, 141 S. E. 240.

What, then, did the parties here intend? Epstein's attorney who drew up the articles of incorporation, the stock certificates and by-laws testified that the declaration of a stock dividend was not contemplated at the time the corporation was organized. We are left to determine what the parties must have meant from a consideration of the language they used, the circumstances surrounding the parties and their conduct. (*Continental Ins. Co.* v. *United States,* 259 U. S. 156.) Before the corporation was formed, Epstein told Tennant that the profits on twenty-five per cent

of the common stock would double his salary of $1000 per month. Moses testified that Tennant was very insistent that the preferred stock should yield a return of seven per cent and should be cumulative, so that he could pay interest on the $10,000 he had borrowed for the purpose of buying the preferred stock. These objects were expressed when the corporation was formed. The articles gave the preferred stock a first lien on the assets of the company in the event of dissolution and a preference of seven per cent cumulative dividend before any dividend should be declared upon the common stock. The stock certificates stated that the preferred stock should receive from the surplus or net earnings of the corporation dividends at the rate of seven per cent and no more. That would seem to be a complete delimitation of the rights of the preferred stock. It certainly negatives an equal distribution of the surplus of the company after the payment of the preferred dividend.

We think the results reached in *Stone* v. *United States Envelope Co. supra, Niles* v. *Ludlow Valve Manf. Co.* 202 Fed. 141, 231 U. S. 394, and *Will* v. *United Lankat Plantations Co.* 1914 A. C. 11, 67 A. L. R. 775, are more nearly in accord with business usage and the expectation of investors when they purchase preferred shares of stock. In *Will* v. *United Lankat Plantations Co. supra*, Earl Loreburn, speaking for the House of Lords, said that a general assumption is well founded that where preference shares are given and a definite preferential dividend is fixed, "that impliedly negatives any right to take any further dividend." It was contended that the rights of preference shareholders ought not to be cut down except where something is found which negatives the right to any further share in the profits. He remarked that people taking the preference shares would doubtless have been surprised to learn that they were to receive the "almost boundless additional advantages which have been held out to them in the arguments we have been

hearing," and that it was really an attempt to add to the terms of the contract "by screwing something out of the articles which the framers of the contract, I do not believe, ever thought of." In *Stone* v. *United States Envelope Co. supra,* it was said: "The other theory, which we believe to be the better and supported by the weight of authority, is, that in receiving the greater security of his preferential rights the preferred stockholder impliedly agrees to accept such rights in lieu of equal participation. The maxim *expressio unius,* etc., applies to this case and is decisive. The parties by a contract embodied in the by-laws have provided for the preferred stockholders a seven per cent preferential dividend, and in case of liquidation one hundred per cent. This excludes other participation." We think the reasoning of these cases applies here. The preferences stated in the stock certificates are a delimitation of the rights of the preferred stockholders.

Another act adverse to appellees' contention is found in the payment of the forty-nine per cent dividend on the value of the 2000 shares of common stock in 1929 and the payment of but the limited seven per cent on the value of 30,000 shares of preferred stock in that year prior to the stock dividend. Appellees contend that by payment of this "equalizing" dividend the case of *Stone* v. *United States Envelope Co. supra,* is rendered inapplicable, but cite *Englander* v. *Osborne,* 261 Pa. 366, 104 Atl. 614, where it is said: "We find nothing limiting the right of the preferred stockholders to the six per cent dividend regardless of the earnings of the company, and in absence of such limitation the general rule is that such stockholders are entitled to share with the holders of the common stock all profits distributed after the latter have received in any year an amount equal to the dividends on the preferred stock." If this rule of law quoted by appellees is correct, the preferred stock should have had a dividend in 1929 of forty-nine per cent instead of seven per cent "and no more," as provided

in the stock certificates. What was paid on the preferred stock shows the interpretation by the parties of their rights and privileges as expressed in the articles of incorporation.

The position of the appellees is that the preferred stockholders are as much parties to the business venture as the common stockholders and are entitled to all the rights of the common stockholders except as modified by statute and contract. (*Star Publishing Co.* v. *Ball, supra; Englander* v. *Osborne, supra.*) In other words, they say that the preferences contained in the articles and the stock certificates are merely delimitations of the preferences and not of the rights of the stockholders. The effect of this would be to make the preferred shares participating when no mention of such a right or interest is contained in the articles of incorporation. The parties had the duty, under the law, to provide for this additional right if they intended to create it.

It is contended that the by-law which gave all stockholders equal right to subscribe to new stock at not less than par entitled appellees to share in the stock dividend. The answer to this is, that the act requires the rights, privileges and interests to be set out in the articles of incorporation and to be again contained in the stock certificates. The contention is also made that what is said in the stock certificates is not controlling, but that since the words "no more" are not found in the articles while they do appear in the certificates, this gives the right to share in a stock dividend to preferred stockholders. For the same reasons this contention is unsound. What the parties did was to interpret and construe the meaning of the articles of incorporation by expanding what was said therein. The obvious purpose of having articles of incorporation and requiring by statute the statement of rights, privileges, etc., therein and in stock certificates, is to make convenient and certain the necessary information as to these matters for the use and protection of the investing public.

Cases involving income taxes and the construction of wills are cited to the effect that stock dividends are not dividends of cash. While this is true, the holders of the majority of the stock in this company cannot do indirectly what they cannot do directly. They cannot, by a stock dividend based upon a by-law intended to cover the situation which would arise if new capital were required, create a right to additional cash dividends in the holders of preferred stock, to the plain detriment of the appellant as one of the holders of the original common stock.

It is strongly urged, first, that since no mention is made of the distribution of surplus assets in case of dissolution, the holders of preferred stock would be entitled to share *pro rata* with holders of common stock after principal and dividends were paid on the preferred stock and a like payment of principal and dividends on common stock. From this it is urged, secondly, that the holders of preferred stock should share in the division of a present surplus executed through the medium of a stock dividend. For two reasons this is illogical and unsound: First, it was not necessary in the stock certificates to use the words "no more" to limit payment of dividends to seven per cent per annum; second, the so-called "consistency rule" does not permit appellees, who are a majority in voting power, to withhold dividends on common stock, pile up a surplus, indefinitely vote a stock dividend to themselves not provided for in the articles of incorporation, and thus deprive the holders of common stock of cash dividends they might have received had these things not been done. The purpose is obvious when it is recalled that cash dividends on all common stock were declared after the stock dividend.

It is strenuously argued that the stock dividend should be allowed to stand because if declared *pro rata* it would effect no change in voting control. While this is true, it very materially changes a more important right, viz., the right to dividends if and when declared. If the rights were

as contended by appellees it would be pertinent to ask, Why would anyone invest $10,000, or any other sum, in common stock in this company? In *Cratty* v. *Peoria Law Library Ass'n,* 219 Ill. 516, we recognized the rule that while the directors of a corporation are given a wide discretion as to the question of declaring dividends, yet if this discretion is abused, or if they act in bad faith or in an arbitrary manner, a holder of common stock may ask the aid of equity to compel the declaration of a dividend. There can be no question that in the opinion of the majority of the stockholders all the surplus was not needed. A dividend would not affect the voting control. No necessity for a stock dividend is shown. Immediate declaration of cash dividends followed the stock dividend. The cash dividends to the holders of preferred stock were increased, and this was the only end served. · In the contract no stock dividend was provided for as to holders of preferred stock. The question, therefore, of voting control is not properly involved in the case, but the question of cash dividends, and the right thereto if cash dividends be declared, is here for a determination. We are aware of the authorities, both of· cases and text writers, which indicate that the element of consideration of voting control makes it necessary that stock dividends be distributed *pro rata* among all shareholders where nothing to the contrary is contained in the contract. In our opinion the authorities mentioned do not control in this case in view of the statute of this State in force when the corporation was organized, the articles of incorporation, the stock certificates' recitals and the construction given the contract by the stockholders, who are the same persons now as were the original shareholders.

For the reasons indicated, the judgment of the Appellate Court is reversed and the decree of the circuit court of Lake county is affirmed.

*Appellate Court reversed, circuit court affirmed.*