CHARLES E. STARR ET AL., APPELLEES, V. ENGINEERING
CONTRACTING COMPANY ET AL., APPELLANTS.

31 N. W. 2d 213

Filed March 3, 1948.    No. 32323.

*Fitzgerald & Smith, Seymour L. Smith, James W. R.
Brown,* and *Robert L. Smith,* for appellants.

*Fraser, Connolly, Crofoot & Wenstrand,* for appellees.

Heard before SIMMONS, C. J., PAINE, MESSMORE,
YEAGER, CHAPPELL, and WENKE, JJ., and LIGHTNER,
District Judge.

LIGHTNER, District Judge.

The finding in the district court was for the plaintiffs,
and defendants appeal.  There seems to be some question
in the minds of the attorneys, at least in the minds of
defendants' attorneys, as to the kind of a lawsuit this
is.  They claim that it is a suit for specific performance.
We will discuss this claim later in this opinion.  That
which precipitated the lawsuit was the attempt by the
defendant White, owner of 90 shares of the preferred
stock and six of the ten shares of the common stock
that had been issued, and therefore the owner and con-
troller of a majority of the voting stock of the corpora-
tion, to amend the articles of the corporation so as to
permit him to convert his 90 shares of preferred stock
into 90 shares of the common stock, and to increase the
amount of authorized common stock from 50 to 150
shares.  The effect of this conversion, as will be explained
later, would result in a large loss to plaintiff Starr.  He
brought this suit to protect his interests as a minority
stockholder.

The defendant corporation was organized as the result of negotiations carried on between plaintiff Starr and defendant White in January and February 1946 and before. The articles were signed and acknowledged on February 18, 1946, and filed on February 21, 1946. The incorporators were the plaintiff Charles E. Starr and the defendant Joseph F. White, Sr., but Mr. White's wife, the defendant O. K. White, was the named incorporator instead of Mr. White.

The events which lead up to the formation of the corporation occurred in the late fall and winter of 1945 and in January and February 1946, and the agreement between Mr. Starr and Mr. White with respect thereto are the subject of the conflicting claims of the parties.

Mr. White, who was a United States government employee, civilian chief of the Utilities Branch, Seventh Service Command, had in the fall of 1945 drawn the plans and specifications for "Removing Two (2) complete B&W steam generating units, plant boilers No. 2 and 3, including all auxiliaries, from building III, St. Louis Administration Center, St. Louis, Missouri and complete reinstallation at Fitzsimmons General Hospital, Denver, Colorado." This was a large job and Mr. White wanted to bid on it. He felt sure that he could underbid any of his competitors. He states that it was legal for him to bid on it personally, even though he had drawn the plans and specifications as an employee of the government for that very work. However, he felt that there would be criticism if he did so, and he therefore decided to organize a corporation to make the bid. To answer the question which naturally arises here we quote from Mr. White's testimony: "Q- Before you formed this corporation and bid on this job, did you make some inquiry as to whether you could be interested in a corporation that contracted with the Federal Government? A- The usual members of the War and Navy Department, under W. D. 2, Article 14, provided that anybody can be with the government and still bid a job, as long as

it is a corporation. Q- Even though you are interested in it? A- Oh, absolutely." Neither the legality of Mr. White's right to bid nor the morality of it are raised in the pleadings or briefs, and we will not further advert to that phase of the case.

The plaintiff Starr worked under Mr. White. They were well acquainted with each other and their families visited back and forth. The contentions of Mr. Starr are that the original plan was that he and White would organize the defendant corporation, Engineering Contracting Company, Inc., with an authorized capital stock of $10,000, of which White would pay in $6,000 and receive 60 shares of the common stock, and Starr would pay in $4,000 and receive 40 shares of the common stock, and that the proceeds and assets of said corporation would be divided in the same way, that is 60 percent to White and 40 percent to Starr. This was while Starr believed that he could raise $4,000 to put into the corporation. It turned out later that Starr could not raise $4,000, nor any considerable part of it; in fact he could only raise $400. Therefore the original plan had to be changed. Mr. Starr's account of what happened is that there was to be an entire change in the set-up of the corporation from a straight common stock company to one that would authorize 100 shares of preferred stock at $100 per share and 50 shares of common stock at $100 per share. However, of the common stock only $1,000 was to be actually issued, of which preferred and common stock Mr. White would buy 90 shares of the preferred stock of the value of $9,000 and six shares of the common stock of the value of $600, a total of $9,600; that Mr. Starr would buy $400 of the common stock, but that in spite of the disparity in the investment by the incorporators, Starr's interest in the corporation would still be 40 percent and he would receive 40 percent of the profits and own 40 percent of the assets, that Mr. White would receive 60 percent of the profits and own 60 percent of the assets, subject, of course, to

the superior claim of White against all of the assets and dividends of the corporation for the $9,000 in preferred stock which he was to purchase.

The corporation was then organized and the articles of incorporation authorized the issuance of 100 shares of preferred stock of the par value of $100 per share, and 50 shares of common stock of the par value of $100 per share. There was then issued immediately after the incorporation of the defendant corporation, 90 shares of preferred stock and six shares of common stock to Mr. White, for which he paid $9,600, and there was issued to Mr. Starr, four shares of common stock of the corporation for which he paid $400. The corporation then bid and, being the lowest bidder, obtained the contract for the removing of the boilers on its bid of $190,432.

The corporation did very little of the work under the plans and specifications, but sublet almost the entire job for a total of $126,487.48, which resulted as can be seen in an enormous profit. Mr. L. G. May, a public accountant, computed the gross profit to be $54,968.19, the net profit, after payment of Federal income taxes, to be $34,180.28, and the book value of each share of the ten shares of common stock to be $3,482.03 as of November 30, 1946. Therefore, the conversion by Mr. White of his 90 shares of preferred stock to 90 shares of common stock would have the effect of giving him 96 percent of the profits and property of the corporation instead of 60 percent which he had or appeared to have theretofore, and would reduce plaintiffs' holdings from 40 percent to 4 percent, or in values would reduce plaintiffs' interest in the corporation from a total value of about $14,000 to a total value of about $1,750. The defendant White's interest would be increased accordingly.

Defendant White denies the claims of plaintiffs that they were to have a 40 percent interest in the corporation as it was finally organized and after it was determined that Starr had only $400 to invest. He admits that, when the organization of the corporation was first talked

about, the division of profits was to be on a 40-60 basis, but that was when plaintiffs contemplated putting in $4,000. He says that when it finally developed that plaintiffs could put in only $400, the plan and interests of the parties were completely changed. Defendant White's account of the final agreement is fully set forth in his testimony as follows: "Q- After the first draft of the articles were submitted there was a change suggested that instead of 100 shares of common stock, there would be ten shares of common stock and ninety shares of preferred stock; was there any particular reason? A- Yes. He came over to my house, and I told him I needed to get down to business, because I wanted to bid, and this job would be let in three weeks. I says, 'I got to go ahead,' He said, 'I cannot get $4,000; all I could put up is $400.00.' Well, I said, 'If you can only put up $400.00, I am not going to give you a 40 percent interest.' He said, 'I would like to get in on $400.00.' I says, 'All right, this is genuine, I will set this up on a $10,000.00 corporation, but I am going to keep 90 shares of the preferred stock for my money, and I will give you four shares for your $400.00. And then I will take six.' 'I am going to take preferred stock to protect myself, and later we will convert this preferred stock to common stock, and we will each share in proportion to our investment. That we would convert this preferred stock into common stock as soon as we got going, and knew that we were going to make a go of it. Q- Did you ever at any time to Mr. Starr, or to anybody else make any statement, after it became evident that he could put only $400.00 in the corporation, that for $400.00 invested in this $10,000 corporation he would have forty per cent of the profits? A- No, I never made a statement like that."

These conflicting claims of Starr and White present, in our opinion, the principal question to be determined here. All other matters in the case are, we think, subsidiary thereto. The evidence which covers nearly

600 pages is directed directly or indirectly to a solution of this problem.

The principal witnesses were Starr and White, and each accuses the other of perjury and asks that the rule falsus in uno, falsus in omnibus, be applied.

The basis of the claim that Starr committed perjury is the fact that he testified that he secured four of the five subcontracts by contacting the officers of the subcontracting companies and that he knew the officers of several of such companies and introduced Mr. White to them; whereas the officers of two of said companies testified that it was not Starr who introduced them to White but that White introduced them to Starr, and that White was responsible for securing the contracts.

The basis for Starr's claim that White committed perjury is the testimony that White presented a fictitious expense account on May 30, 1946, for $1,546.80 for seven out-of-town trips to line up the subcontractors, whereas the evidence of Mrs. Love, chief of the Civilian Personnel Branch of the government at Fort Omaha, who keeps the records pertaining to civilian employees including the records pertaining to Mr. White, shows beyond any question by the official records of her office that Mr. White during the time he claims to have been traveling in behalf of the defendant corporation incurring these large expenses was actually working for and getting paid by the government, and was getting his expenses from the government on such out-of-town trips as he took. The actual days of the month that Mr. White was working in his office in Omaha are shown by these records which Mrs. Love produced. On some of these same days that he claims in his expense account that he was hundreds of miles away procuring these contracts for the corporation which was later organized Mrs. Love's records show that he was in Omaha, drawing pay from the government, in his official capacity.

There is apparently, therefore, some basis for the

claims that both Starr and White were guilty of perjury. Assuming that they were equally guilty in this respect we turn to a consideration of the evidence. The district court found in favor of the plaintiffs and we believe that the preponderance of the evidence supports the finding of the district court.

Four considerations force us to this conclusion. First, there is the evidence of Herbert T. White (not related to the defendant White), a lawyer in Omaha who drew the articles. The substance of his evidence is that on February 13, 1946, Starr and White brought the articles back to his office and suggested that certain changes be made therein. These changes provided for both preferred and common stock. Instead of Starr borrowing $4,000 from White, the corporation was to issue only 10 shares of common stock of which Starr would purchase four and White would purchase six. White would purchase 90 shares of preferred stock. At this time Starr and White again discussed their proportionate shares in the corporation and White again stated that he would take a 60 percent share in the profits and that Starr should have 40 percent. Herbert T. White then prepared new articles on this basis. At each meeting in Herbert T. White's office, Starr and White stated that their respective shares in the profits of the corporation were to be 60 percent to White and 40 percent to Starr. The second and final set of articles were signed February 18, 1946.

Second is the fact that the division of the common stock of the corporation as made by the parties themselves, four shares of the common stock to Starr and six shares of the common stock to White, would entitle Starr to a 40-60 division of the profits and assets. Elko Lamoille Power Co. v. Commissioner of Internal Revenue, 50 F. 2d 595; Nichols v. Olympia Veneer Co., 139 Wash. 305, 246 P. 941; Heimbaugh v. Hitchcock, 115 Kan. 182, 222 P. 114; 11 Fletcher Cyclopedia, Corporations, § 5083, p. 28; 13 Am. Jur., Corporations, § 423, p.

475; 13 Am. Jur., Corporations, § 683, p. 685; 13 Am. Jur., Corporations, § 705, p. 721.

Third, there is the interesting and mysterious transaction of May 30, 1946, above referred to involving the fictitious expense accounts, described by Mr. Starr as follows: "Q- Did you receive any compensation whatsoever from the corporation? A- Yes, sir. Q- What did you receive? A- I received what is considered a dividend of $1031. Q- When did you receive that? A- I received that in May. Q- Recite the circumstances under which you received that? Mr. Smith: What is the amount? The witness: $1021.20. ($1031.20.) A- I came into the office one Saturday morning, Joe White was at the desk, and had the same kind of paper as you have in your hand there, he says, 'I am taking $1,000 a month out of this Company, because,' he says, 'I don't have to pay any income taxes on expenses,' he says, 'You are to get 40 per cent of that $1,000, which will give me $600.00, and you $400.' He prepared this fictitious expense account sheet, and the next Monday morning he says to me, 'Here is my expenses, you make yours up accordingly. * * * Q- How much was paid to Mr. White? A- $1546.80, which made a total of $2578." This happened long after all of the subcontracts had been entered into except the last one and when it was quite apparent that the corporation would reap an almost fantastic profit. ($103,931 of the subcontracts were dated March 20, 1946, one for $15,188 was dated April 8, 1946, and the last one for $7,368.48 was dated May 29, 1946.) It will be noted that the $2,578 taken by the two fictitious expense accounts, $1,546.80 to White and $1,031.20 for Starr, is exactly a 60-40 division of the money which was taken, and is a strong confirmation of plaintiffs' claim that the division of the profits was to be 40-60, 40 percent to Starr and 60 percent for White. Let it be said to Starr's credit that he reported this $1,031.20 as income, and not as White suggested to him as expense, which, of course, would have

been totally fraudulent. If it be said that this was before White attempted to convert, and represented Starr's actual interest at that time, it still must be remembered that White would probably not actually give Starr a 40 percent cut if his interest was only 4 percent, especially in view of White's claim that he told Starr during the final conversation just before the organization that they would convert as soon as they got going and knew they were going to make a go of it. At the time that this $2,578 was distributed they had been operating several months, the subcontracts had been let, and a large profit was assured.

Fourth, the articles did not provide for conversion by White of his 90 shares of preferred stock for 90 shares of common stock. Such a provision could easily have been put in, and would have been put in, we think, by lawyer White if that had been the agreement of the parties. The articles did not provide for the issuance of sufficient common stock to make the conversion, but for 50 shares only, whereas 100 shares would have been required. Appellants now claim that because there is a provision in the articles for amendment by a vote of 60 percent of the common stock, it indicates that White had the right to convert. However, it is not reasonable to assume or find that lawyer White would have resorted to this clumsy method and left to the uncertainty of parol evidence the establishment of this important and vital provision if the understanding between the parties had been as White now claims that it was.

A number of questions of law are discussed in appellants' brief. Appellants contend that Starr is attempting to vary and contradict the terms of the articles of incorporation by parol evidence. The fact is that Starr is relying on the articles of incorporation as they stand, and that it is White who wants to reform the articles in order to permit an amendment which would have the effect of confiscating Starr's interest in the corporation. White says he reserved the right to con-

vert his preferred stock into common stock, but he did not make such reservation in the articles. The claim of White that he has a right to amend in this way because the articles provide that they may be amended by a 60 percent vote of the stock is contrary to law. The kind of amendment referred to in the articles is a legal amendment, not an illegal amendment which would enable White to destroy a large part of the value of Starr's shares in the corporation.

White claims again and again that the suit is one for specific performance. It does not seem so to us. However, it is not the form of the action which controls. If the pleadings and evidence entitled Starr to the relief asked, the court should give it to him regardless of how his cause of action is denominated. Here again it is White who either seeks specific performance, or a reformation of the original articles. The articles of incorporation do not give White the right to make the amendments in question, nor does the fact that he owned 60 percent of the common stock and all of the preferred stock issued give him such right as against a minority stockholder who will be damaged. In order to convert under the circumstances existing in this case he must prove an oral reservation of the right to do so, since such right was not reserved to him in the articles. This burden he has failed to sustain.

The defendant White objects to the evidence of lawyer White on the ground that it varies the articles of incorporation. Lawyer White's testimony, however, is to the effect that the exact agreement of the incorporators was put into the articles and was followed out, just after they were filed, by the issuance of four shares of the common stock to Starr and six shares of the common stock to White, which would give them the 40-60 interest in the corporation claimed by Starr. White sets forth other propositions of law, most of which are answered by the discussion already made.

White's eighth proposition of law is that when Starr

signed the articles of incorporation, knowing that they provided for amendment without restriction by the majority of stockholders without his consent, that he cannot now complain because White exercised his lawful rights as a majority stockholder to amend the articles and provide for conversion of the preferred stock to common stock. A number of cases are cited in support of this proposition, all of which we have examined. None of the cases cited by defendant White goes so far as to hold that a majority stockholder can, under the circumstances in this case, manipulate the stock or property of the corporation in such a way as to prejudice the rights of the minority stockholders. To permit any such manipulation would place the minority stockholders at the mercy of the majority stockholders. The following cases hold that the majority stockholder has a duty to a minority stockholder and cannot, by amending the articles of incorporation, deprive the minority without their consent of their contractual rights to dividends under the articles as originally adopted. Hueftle v. The Farmers Elevator, 145 Neb. 424, 16 N. W. 2d 855; Heimbaugh v. Hitchcock, *supra;* Tennant v. Epstein, 356 Ill. 26, 189 N. E. 864; Johnson v. Bradley Knitting Co., 228 Wis. 566, 280 N. W. 688; Theis v. Durr, 125 Wis. 651, 104 N. W. 985; Forrest v. Nebraska Hardware Co., 91 Neb. 735, 137 N. W. 839; Ponca Mill Co. v. Mikesell, 55 Neb. 98, 75 N. W. 46.

A great many propositions and questions are presented in appellants' brief. It would extend this opinion beyond reasonable length to answer each of them specifically. While we have not discussed all of such propositions we have given them all careful consideration and we believe that this opinion either directly or by necessary implication answers all of the principal contentions made by appellant White. The judgment of the district court is affirmed.

AFFIRMED.

SIMMONS, C. J., did not participate in the decision of this case.

MESSMORE, J., concurring.

I concur separately with the legal principles announced in the opinion.

The record discloses that one of the parties to the litigation was an employee of the United States government as civilian chief of the Utilities Branch, Seventh Service Command, and in the fall of 1945 had drawn the plans and specifications for removing two complete B&W steam generating units, plant boilers Nos. 2 and 3, including all auxiliaries, from building III, St. Louis Administration Center, St. Louis, Missouri, and complete reinstallation at Fitzsimmons General Hospital, Denver, Colorado. This was a large job, and this government employee felt sure he could underbid any of his competitors; that he could bid personally, even though he had drawn the plans and specifications as an employee of the government for that very work. However, he felt that undue criticism might attach to him under the circumstances, if he should bid personally. Under what has been identified as W. D. Contract Form No. 2, Article 14, he claims he would be privileged to bid and still hold his government position as long as the bid was made by a corporation. A corporation was formed; the stock divided as shown in the opinion, and the unconscionable profits made by these federal employees are shown in the opinion.

I believe that in equity and good conscience, such employees should not be permitted to take advantage of their position, as occurred in this case. I can see nothing equitable in what the parties to this action did.

I desire to call attention to this matter, in the hope and expectation that conditions of this kind may be subsequently rectified should this country become engaged in another emergency.