**ST. LOUIS SOUTHWESTERN RAILWAY COMPANY, a corporation, Plaintiff,**

**v.**

**Louis M. LOEB and John A. Cook, Executors Under the Will of Walter E. Meyer, deceased, et al., Defendants-Appellants (Common Stockholders of St. Louis Southwestern Railway Company),**

**and**

**Southern Pacific Company, a corporation et al., Defendants-Respondents (Preferred Stockholders of St. Louis Southwestern Railway Company),**

**R. Walston Chubb, Mabel Frank et al., Defendants in Default.**

**No. 46105.**

Supreme Court of Missouri,

En Banc.

Nov. 10, 1958.

Rehearing Denied Dec. 8, 1958.

George A. McNulty, St. Louis, for appellants Koenigsberg et al.

Thompson, Mitchell, Thompson & Douglas, James M. Douglas, Shepley, Kroeger, Fisse & Shepley, Harry W. Kroeger, Roberts P. Elam, St. Louis, Lord, Day & Lord, Sherman Baldwin, Thomas F. Daly, Saul L.

Sherman, New York City, for appellants Louis M. Loeb et al.

Gleick & Strauss, St. Louis, Abraham K. Weber, William H. Yaeger, New York City, for appellant Louis Yaeger.

Coburn & Croft, St. Louis, Mudge, Stern, Baldwin & Todd, New York City, Paul D. Miller, New York City, Richmond C. Coburn, St. Louis, Bernard Nemtzow, New York City, Frank Booker, St. Louis, of counsel, for respondents Southern Pac. Co. et al.

EAGER, Judge.

This suit was filed in November, 1951, by St. Louis Southwestern Railway Company, a Missouri corporation, as an interpleader proceeding. Certain of the defendants denied plaintiff's right to maintain the suit, but the Circuit Court sustained the interpleader and discharged plaintiff. On appeal, that judgment was affirmed. Many of the facts and considerable history of the controversies appear in that opinion at 364 Mo. 1057, 272 S.W.2d 249. Thereupon the various contesting parties filed appropriate pleadings setting forth their respective claims; we shall not review any part of the pleadings. They are sufficient to raise the points to be determined.

The sole question involved here is whether the preferred stockholders of plaintiff are entitled to participate with common stockholders in dividends after the preferred stock has received the stated 5% preferential dividend in any given year, and the common has received a like dividend. The problem is very simply stated, but the simplicity ends there. The suit is a proper class suit; not only did the trial court so find in the first instance, but more than 98% of the preferred stock is represented in the case and the holders of over 93% of the common stock are either represented or were duly served. There can be no possible doubt that each class is adequately represented and most ably represented. In 1951 plaintiff declared and paid dividends of 5% on both its preferred stock and its common stock; later in the year it

declared a further dividend of $1 on each class of stock. Then, deeming the matter controversial, it filed the present interpleader suit, and set aside for the purpose of the payment $370,648, which sum was later paid into the registry of the court. All concede that the common stock may properly receive its 1%; the common stockholders deny that the preferred is entitled to any participation after receiving the 5% already paid to it. The prior appeal and the judgment rendered here thereon did not involve the merits of the present controversy. The trial court here determined that the preferred stock should participate, for reasons to be mentioned later, and common stockholders have appealed.

It will be necessary to give some history at this point. The present plaintiff, commonly known as "The Cotton Belt," was incorporated on January 16, 1891, pursuant to a plan of reorganization. It took over, following foreclosure, the assets and properties of two financially embarrassed railroads, the St. Louis, Arkansas and Texas Railway Company in Texas, and the St. Louis, Arkansas and Texas Railway Company in Arkansas and Missouri; these same roads had been in a prior receivership about 1886. Defaults in bond payments occurred in 1888 or 1889, and other financial difficulties accumulated. At that time these railroads sold $6,700,000 of their second mortgage bonds and 9,000 shares of their capital stock (common) to a syndicate in New York headed by Jay Gould, for slightly more than two million dollars; that syndicate made other purchases of the securities and became substantially interested. In June, 1889, a bondholders' committee began holding meetings in New York to consider a plan of reorganization. Its minutes described the committee as "1st. M. Bondholders Committee." It held approximately 40 meetings and was in touch, from time to time, with like committees of security holders in England and Germany. Its minutes appear in the record here. Mr. Gould met with the committee on at least two occasions. This com-

mittee prepared the plan of reorganization which was ultimately accepted by all, or substantially all, of the holders of securities in the old companies. The plan provided for issues of first and second mortgage bonds (each 4%), $20,000,000 in "Five Per Cent Preferred Stock (non-cumulative)" and $16,500,000 in common stock. The new first mortgage bonds were issued, in large part, to the holders of the old 6% first mortgage bonds, although some were sold to pay debts and raise cash; the second mortgage bonds were issued in part to the old first mortgage bondholders to compensate for an interest reduction, in part to second mortgage bondholders and common stockholders as compensation for assessments paid by them in cash, with the remainder to be sold for cash if needed; the new preferred stock was issued entirely to bondholders, chiefly to the holders of the old 6% second mortgage bonds, but with a minor proportion (approximately 14%) issued as added compensation to first mortgage bondholders. The common stock was issued, share for share, in lieu of the old stock. For our purposes, it seems to be conceded that all of the old security holders accepted the plan by the deposit of their securities; at least there is no record of any dissent. In several places the plan referred to the issue of "Five Per Cent Preferred Stock"; in one of these places the term "non-cumulative," in parentheses, was added; at no place was it stated that this stock was to be "participating" or "non-participating." The method of exchange of securities was provided for in specific detail, and the issuance of $20,000,000 of 5% preferred stock was an integral part of the plan. The committee was expressly authorized as "agents and trustees to carry out said plan * *." One of the counsel for the committee was Victor Morawetz, an eminent authority of that day on corporation law, and the author of a treatise later referred to. Mr. Morawetz was also active in the early corporate organizational meetings, was one of the incorporators, and it may fairly be assumed that he was the author, or at least one of the authors, of the early corporate documents, records and minutes.

The original incorporators were nine in number; they subscribed to 6,000 shares of stock and constituted the only original stockholders and the corporation's first board of directors. On January 16, 1891, the Articles of Association were filed and meetings of the stockholders and directors were held. The Articles provided that the "number of shares * * * is three hundred and sixty-five thousand * * * of one hundred dollars ($100) each." At the meeting of directors the following resolution was adopted (after spreading upon the minutes a consent of all the stockholders in substantially identical form): "Resolved, that 200,000 shares of the capital stock of this Company shall be issued as a preferred stock upon the following terms and conditions, viz.: The holders of such preferred stock shall be entitled in each year to receive dividends at the rate of five per cent per annum, payable out of the net profits of the Company, before any dividends shall be declared or paid on the common stock for such year; but if in any year dividends amounting to five per cent shall not be declared payable on the preferred stock, the holders shall not thereafter receive any further dividends for said year—the dividends on such preferred stock not to be cumulative." This resolution was later ratified at a meeting of stockholders. The form of preferred stock certificate which was approved and thereafter used was substantially identical to the resolution just quoted. The form of common stock certificate contained the following provision: "The common stock of the Company is subject to the right of the holders of the preferred stock to receive in each year dividends (non-cumulative) not exceeding five per cent before any dividend shall be declared or paid for that year on the common stock." These two forms of certificates, with only minor changes, are still in use.

The securities were duly issued and delivered, changes made in the Board of Di-

rectors to afford adequate representation to security holders, and the operation of the road proceeded. No additional preferred stock has ever been issued and only a small amount of common, the latter being used in the acquisition of certain short-line railroads. At the filing of this suit there were outstanding 198,837 shares of preferred and 171,811 shares of common. No dividends whatever were paid until 1919, two severe periods of depression having ensued in the interim. In fact, the preferred stockholders state that for many years the question of dividends was "wholly academic." From 1909 to 1930, inclusive, preferred dividends were paid intermittently, aggregating $64\frac{1}{4}\%$ and averaging substantially less than 5%. No common dividend was paid until 1948, approximately 57 years after the incorporation. Beginning in 1948, dividends of 5% have been paid regularly on each class. The company was in bankruptcy from 1935 to 1947, but during the later years of that period it became relatively prosperous and accumulated a very substantial surplus. No dividends were paid, of course, during the period of bankruptcy. It would appear from the surplus shown on plaintiff's balance sheet that the 1% dividend here in controversy is more or less of a "trial balloon." No dividend exceeding 5% in any year has ever been declared or paid on either class of stock, except for the 1% dividend now in controversy.

Beginning about 1930 the Southern Pacific Company began to acquire a substantial stock interest in the Cotton Belt. In 1932 it was granted permission to acquire control. 180 I.C.C. 175. At the time of the filing of this suit it held all of the stock except 4,420 shares of the preferred and 39,408 shares of the common; its holdings were thus in excess of 98% of the preferred and 77% of the common. Seven of the nine directors of plaintiff were then officials of the Southern Pacific. Apparently both classes of stock have exercised equal voting rights, although nothing specific appeared concerning that in the Articles or corporate minutes.

Many exhibits were offered and received; some were excluded. No point has been made in any brief on the admission or exclusion of evidence. The memorandum opinion of the trial court was as follows: "The Court is of the opinion that a reasonable construction of Section 2558 Revised Statutes Missouri, 1889,[1] in the light of its legislative history, would make it applicable to a railroad company preferred stock issued while it was in force and providing a preference up to 10%, and render such stock participating after a dividend equal to the preference had been declared on the common stock. Necessarily, then, it would have that effect on the preferred stock of the St. Louis Southwestern Railway Company. Aside from said statute, the Court is further of the opinion that a reasonable construction of the documents and interpretation of the circumstances relating to the reorganization of the St. Louis, Arkansas & Texas Railway Company and the issuance of the St. Louis Southwestern Railway Company's preferred stock, in the light of the legal and lay opinions of that time, would also render such stock participating. Consequently, the preferred stockholders of the St. Louis Southwestern Railway Company are entitled to participate with the common stockholders in the dividend declared on November 26, 1951." A Decree was entered in conformity with that opinion. Certain other facts will be noted from time to time, as necessary.

As previously stated, the ultimate question here is whether "the preferred stock of the Cotton Belt is entitled to share equally with the common in all dividends declared in a given year after the preferred has first received its stated 5% preferential dividend and the common has then caught up by receiving an equivalent $5 dividend." (Quoted from Appellants' Banc brief.) This question, in turn, resolves itself into three subdivisions, as briefed by the parties, namely: (1) "Does

1. Now V.A.M.S. § 388.220.

Section 2558, Mo.R.S.1889, confer participating dividend rights upon the Cotton Belt preferred stock?" (2) "Did the parties to the corporate contract creating the Cotton Belt preferred intend it to have * * *" such right? (3) Apart from the statute, and with no intent ascertainable from the contract, does the common law establish a presumption of such participation? With reference to (2) above, the preferred stockholders lay much stress on what they have variously described as the "legal and lay opinions of that time," and as "the general understanding in 1891." There is no direct Missouri authority whatever on the questions involved here. An opinion was written and adopted in this case in Division One; subsequently, however, the cause was ordered transferred, of the Court's own motion, to the Court en Banc. In that opinion it was held that the preferred stock was entitled to participate upon the theory that § 2558, RSMo 1889, was applicable and controlling. That opinion failed of adoption in the Court en Banc and the case has been reassigned.

We shall first consider this statute which has been urged as controlling. For convenience, we quote it here, as follows: "Any railroad company organized under the laws of this state may issue a preferred stock for such amount, and upon such terms and conditions, as the board of directors may prescribe. But before any issue of such preferred stock shall be made, the question of issuing the same, together with the terms, conditions and privileges upon which the same is proposed to be issued, shall be submitted to a vote of the stockholders of said company, at a regular annual election for the directors thereof, or at a special meeting of the stockholders of said company called to consider the same, if at such election all the stockholders shall consent. At all elections called to consider the question of issuing preferred stock, as provided in this section, no person shall be permitted to cast any vote as a proxy for the owner of any share or shares of stock without he shall produce written

authority, signed by the owner thereof, and duly acknowledged before some officer having authority to take the acknowledgment of deeds; and a record of such authority showing the name of the owner of the stock, and the name of the person casting such vote in his behalf, shall be entered upon the records of the company in a book to be kept for that purpose; *and it is also further provided*, that when a dividend of ten per cent per annum shall have been declared upon the preferred stock of any company, issued in pursuance of this section, then all other dividends shall be declared and distributed *pro rata* until the dividends on the common stock shall equal the dividends on the preferred stock, among all the stockholders of such corporation; *and provided further*, that nothing contained in this section shall be so construed as to give the holders of the preferred stock herein provided for any other or greater power in the control and management of any corporation, or in the election of the officers thereof, than is exercised by the owners of the original or common stock of such company. Said preferred stock shall be offered to all the common stockholders *pro rata* in proportion to the amount of common stock held by them. If any common stockholder shall fail to take such preferred stock after thirty days' notice by publication in two daily newspapers in St. Louis, and written notice to clerks of counties holding stock, then any other person may buy said stock. (R.S.1879, § 780.)"

The many pages of argument in the briefs devoted to constructions of this statute, pro and con, and even a casual reading, demonstrate that the legislative intent was very inartistically expressed, to say the least. It was first enacted in 1871 (Laws 1871, p. 53) with differences which will be mentioned later. At that time the building of railroads and the attraction of foreign capital was highly important. Until 1853 all Missouri railroads were incorporated by Special Acts of the legislature; this was prohibited by the 1865

Constitution. Art. VIII, § 4, V.A.M.S. The issuance of railroad preferred stock was sometimes regarded as a sort of "hybrid" method of raising capital, somewhere between mortgage bonds (with their burdensome fixed charges) and common stock (which had apparently not been very attractive). The state had invested heavily in railroad bonds (prohibited after 1865) and had lost millions in the liquidation of these, ending in 1868; cities, towns and counties still owned large amounts of railroad common stock in 1871. In 1868 business corporations were authorized to issue preferred stock at a rate of dividend "not exceeding ten per centum" (Laws 1868, p. 29). It can hardly be doubted that any corporation might have issued preferred stock, in the absence of statutory prohibition, by the unanimous consent of all its security holders, with or without express statutory authorization. 120 Amer.Law Reg. 634–1881; Kent v. Quicksilver Mining Co., 78 N.Y. 159; Morawetz, Private Corporations (1886), Vol. 1, § 464. But the consent of the common stockholders could not always be assumed or procured. The 1871 statute conferred the right upon railroad directors to issue preferred stock upon the consent of a majority of the existing stockholders. This majority consent phase of the statute was eliminated by the 1875 Constitution (Art. XII, § 10), V.A.M.S. which required unanimous consent thereafter. In 1864 The Hannibal & St. Joseph R. Co. was authorized by Special Act (Laws 1863–1864, p. 482) to issue its 7% preferred stock, and it thereupon issued that stock with *express* provisions for participation. It seems that the 1871 Act was passed, at least in part, for the benefit of the North Missouri Railroad (Special Laws being then prohibited), which was in an embarassed financial condition; thereupon, in 1871, it was reorganized and issued preferred stock, but this stock was *expressly* made participating. We have mentioned these two isolated and individual instances as of some possible historical benefit in construing the statute. It may well be that this statute was primarily enacted for the benefit of then existing railroads, as some of the language would indicate, but its impact was not so confined. We have been referred to numerous excerpts from debates in the legislature and in the 1875 Constitutional Convention, and to the views of many financial and economic writers, as illustrative of the purpose and intent underlying this statute. Some of these may properly be considered, some may not. They are not determinative. It seems that by 1875, if not sooner, the representatives of the people of Missouri had begun to "sour" somewhat on the issuance of preferred stock by railroads; but the method remained as one valuable to all concerned in the raising of capital, even for the common stock in times of financial crises.

Sundry rules of construction are urged upon us by the preferred stockholders, with citations of authority. There need be no controversy about these. Generally, we must seek to gather the intent of the legislature from the ordinary meaning of the words used, considering the whole Act and its legislative history, and if necessary, considering also the circumstances and the usages of the time; and we must seek to promote the purpose and objects of the statute, and to avoid any strained or absurd meaning. Authorities are also cited to the effect that clerical errors, errors in spelling, grammar or punctuation, and "inaccuracies" in a statute may be corrected by the courts. State ex rel. Consolidated School Dist. No. 1 v. Hackmann, 302 Mo. 558, 258 S.W. 1011; State v. Brinkley, 354 Mo. 337, 189 S.W.2d 314, 335; State ex rel. American Mfg. Co. v. Koeln, Banc, 278 Mo. 28, 211 S.W. 31. Such is true, but that power should be sparingly exercised, and then only to effect the intent and purpose of the legislature,—never to change it.

The basic difference between the parties here is whether or not this statute constitutes a *grant of participating rights to preferred stock*, or whether it constitutes a *grant* to railroad corporations *of*

*the right to issue preferred stock* on terms of their own choosing, *with limitations on any right of participation* which the corporation might confer. Clearly the first sentence, "Any railroad company organized under the laws of this state may issue a preferred stock for such amount, and upon such terms and conditions, as the board of directors may prescribe, * * *" is in the nature of an enabling act, at least recognizing, if not conferring, the right to issue such stock. The second sentence, as amended in 1879 in an attempt to require unanimous consent, is very awkward in expressing its purpose. Then follow clauses: (1) a limitation on the use of proxies at such meetings; (2) the much controverted "provided" clause re participation; (3) the renunciation of any intent to give corporate control to any preferred stock by virtue of the statute; (4) a requirement that the preferred be first offered pro rata to common stockholders; and (5) a requirement of notice by newspaper publication and by written notice to clerks of *counties holding stock.* For convenience, we repeat here the controverted "provided" clause (2-supra): "* * * *and it is also further provided,* that when a dividend of ten per cent. per annum shall have been declared upon the preferred stock of any company, issued in pursuance of this section, then all other dividends shall be declared and distributed *pro rata* until the dividends on the common stock shall equal the dividends on the preferred stock, among all the stockholders of such corporation; * * *".

█ It will be impossible to discuss the various constructions, possibilities, and refutations of the many briefs. We have concluded that the "provided" clause in question is a limitation, and not an affirmative grant of participating rights as claimed here by the preferred stock. We do not think the legislature purported or intended to usurp the functions of corporate directors; it gave to such directors full discretion to issue preferred stock upon their own "terms and conditions," which power would most certainly include the choice of making preferred stock participating or nonparticipating. The proviso (as we shall sometimes call it) concerning participation appears within a group of limitations and conditions imposed upon the general power conferred. As we construe it, it is only applicable where (as stated) "a dividend of ten per cent per annum" has been declared upon the preferred stock; we do not feel authorized to insert the words "up to" (as the trial court did), or "not exceeding," before the phrase "ten per cent." That would go far beyond any "minor judicial interpretation" as urged upon us by the preferred stock; it would constitute a major operation. In our opinion the proviso does not apply to any preferred stock upon which dividends of 10% have not been declared in any given year (singly or in the aggregate), and it is, therefore, simply not applicable to the present stock. We shall not attempt here to follow, adopt, distinguish or repudiate the various affirmative meanings attributed to the clause, pro and con. We hold that the intention was to prevent (except by "delayed" participation after the common stock caught up, and where otherwise permitted) any and all payments in excess of 10% upon preferred stock in any given year, whether by a stated preference in excess of 10%, or by a stated preference for less, plus a participation in excess dividends. It is not controlling to say (as is now done) that there was then no railroad preferred stock with a preference over 10%; the legislature may well have been considering, as of that time, future possibilities. The proviso is awkward; it could have been more simply stated so as: (1) to impart an affirmative grant of participating rights, if intended; or (2) so as to be more clearly a pure limitation. It is not for us to argue or suggest what the legislature might have done; we have the statute before us as written, and we must construe it. It is perhaps impossible to make a completely harmonious whole out of the statute. Respondents more or less assume that this proviso constitutes

a "Participation Clause," and they refer to it as such, meaning, as we understand, a positive and affirmative grant of participation to preferred stocks. Therein we think they are mistaken. We see no indication that the legislature was attempting or presuming, to fix an ultimate equality in all events between common and preferred stocks of railroads; it simply did not wish to let any such preferred stock receive unlimited dividends by action of the directors, to the disadvantage of the common stock, much of which was still held by governmental units. The latter phase of the matter is precisely indicated by the requirement of notice "to clerks of counties holding stock." This limitation on participation remained in effect even after the 1875 Constitution required unanimous consent for the issuance of preferred stock generally. We cannot agree that this proviso was necessary (particularly when considered with the first sentence of the statute) to bring into *effect* or to permit the element of participation. The directors had that power. The proviso could only apply to a preferred stock expressly made participating by contract (or to one which the law construed as participating). We fail to see how the proviso could have been designed to help in the financing of railroads by providing affirmatively for participating preferred stock (allegedly more attractive) if and when the directors already had that right and power by virtue of the enabling provision; and certainly the form and nature of the "attractions" of a stock issue might better be left to the directors in each individual case.

The preferred stockholders argue that the incorporators here followed this statute "slavishly," and that they are entitled to its proffered benefits of participation. Perhaps they did, for one reason or another (possibly because of a fear that a failure to comply might invalidate a preferred issue, even though unanimously agreed to), but if the statute, in and of itself, *confers* no affirmative right of participation, they could acquire no such right by a compliance with it. The only change made in 1879 in the so-called "participation" clause was a change of the word "after" (as in the 1871 version) to "until," so that in the 1889 version (controlling here) it was provided that all further dividends should be distributed pro rata (after 10% was declared on the preferred) *until* the common dividends equalled the preferred. Battles rage in the briefs over this word; the preferred stock insists that it constitutes an error in the copying of a longhand version of the Act, other evidences of errors supposedly appearing elsewhere; perhaps it does. The common stock seeks to support the word verbatim by a construction which we admit that we do not follow. If this word were controlling in its effect, we should be inclined to consider it as an error, either in the writing, or one attributable to some quirk in the mind of the author of the amended version. Giving to the word "until" its ordinary meaning, it is perfectly obvious to us that the dividends on the common stock could never be made to equal the dividends on the preferred; for if all distributable earnings were distributed "*pro rata*" after the preferred had gotten a 10% running start, there would always remain a 10% lag. The meaning or use of this particular word becomes immaterial in view of our general construction that the proviso of the statute is not applicable here. The case of Bailey v. Hannibal & St. Joseph R. Co., C.C.Mo., Fed.Cas.No.736, 1 Dill. 174; 17 Wall. 96, 84 U.S. 96, 21 L.Ed. 611, was decided in the trial court in 1871; the decision in that case, or its pendency, may well have had some influence in causing the controverted proviso to be included in the statute, for the case involved a controversy as to *when* the participation of an *expressly participating* preferred stock should begin, i. e., *immediately* after it had received its preferential dividend (immediate participation), or '*after*' the common had received an equal dividend (delayed participation), thus allowing the common to "catch up." Considering the statute from this angle, the legislature apparently chose the latter

method as a limitation upon the rights of all preferred stocks which had been made participating. It would, as argued, be illogical for the statute to provide affirmatively for participation by a preferred which had already received 10%, and not to so provide on stocks with a lesser dividend, say 5%; but on our construction, the statute *did not provide for or require any participation* at all; it merely permitted it, and limited its extent. The common stockholders liken this statute to the usury statutes (RSMo 1879, § 2724, p. 458[2]); perhaps there is some similarity, but it is unnecessary to discuss that. The so-called "trend of the times," i. e., to promote the financing of railroads, does not convince us that the legislature of 1871 intended to usurp the functions of railroad directors and impose a requirement of participation upon all preferred stocks; to us, that is contrary to the terms used and to the very structure of the Act, considered as a whole. We thus hold that the statute is not applicable.

◼ We must next consider the corporate contract to ascertain whether it discloses an intent that the preferred stock should participate. In so doing we shall not confine our consideration to the corporate minutes and resolution formally providing for the issuance of the preferred stock, but we shall look also at the plan of reorganization, the circumstances surrounding its adoption, and all pertinent corporate papers. Machen, Modern Law of Corporations (1908), Vol. 1, § 549, p. 457; Bailey v. Hannibal & St. Joseph R. Co., 17 Wall. 96, 106, 84 U.S. 96, 106, 21 L.Ed. 611. The committee which promulgated this plan had many meetings and its minutes are preserved. The plan provided for the issuance of the "Five Per Cent Preferred Stock (non-cumulative)" as an integral part of the reorganization. This plan was the thing actually adopted by the security holders. Thus we see that from the very inception all the new capital stock was

not intended to be identical. The plan makes no reference to participation by the preferred stock in any surplus earnings, nor does any other document. The resolution and consent adopted after the Articles were filed, provided that 200,000 shares of the capital stock should be issued "as a preferred stock" and that the holders should be "entitled in each year to receive dividends at the rate of five per cent per annum, * * * before any dividends shall be declared or paid on the common stock for such year"; then followed specific provisions making the stock noncumulative. The form of preferred stock certificate was substantially identical to the resolution. The common stock certificate provided that the common stock was "subject to the right of the holders of the preferred stock to receive in each year dividends (noncumulative) not exceeding five per cent before any dividend shall be declared or paid for that year on the common' stock." The forms of the stock certificates were duly approved.

◼ It is a little difficult to read the minds of the people who drew these contract documents in 1889–1891; we must be governed largely by what they wrote. We see nothing on the face of the contract to indicate an intent that the preferred stock should participate in dividends after receiving its stated 5% in any year; indeed, the term "not exceeding," as used in the common stock certificate, at least leans toward nonparticipation, but more will be said of that later. Counsel for the preferred stock here rely strongly upon a "general understanding" (and a "fundamental assumption") in 1891 that the preferred stock possessed participating rights unless the contrary was expressed; or, as the trial court expressed it in its memorandum opinion, that the stock was participating "in the light of the legal and lay opinions of that time." Counsel have furnished us with a bibliography of approximately 50 texts, treatises and articles, some

2. Now V.A.M.S. § 408.030.

legal, some financial and some historical. We have read all of those which are available to us. These, we are sure, furnish a comprehensive picture of the group. Some, being neither legal writings nor properly in evidence (many not even being offered), we would not consider, anyway. These texts are cited primarily as indicating an understanding or presumption of participation at the time in question. Of the texts cited, four were written before 1891, namely: Beach, The Law of Railways (1890); Wood, Railway Law (1885); Rorer on Railroads (1884); and Pierce, A Treatise on Railroad Law (1881). Counsels' theory seems to be that the incorporators knew of these authorities, and of such an "understanding" generally, and relied upon a presumed or implied intent of participation. Wood, Rorer and Pierce do make statements, in differing forms and manner, of the right of preferred stock to participate in any surplus of earnings after the common stock has been paid a dividend equal to the preference. Pierce refers to this as "the plan usually adopted," but the text seems ambiguous as applied to a plan which is wholly silent on participation. Beach, supra, refers to a corporate bylaw specifically providing for participation (Hazeltine v. Belfast & M. S. R. Co., 79 Maine 411, 10 A. 328, 1 Am.St.Rep. 330), but, so far as we can see, makes no general statement of implied participation. Wood cites the cases of Bailey v. Hannibal & St. Joseph R. Co., 84 U.S. 96, 17 Wall. 96, 21 L.Ed. 611, and Elkins v. Camden & A. R. Co., 36 N.J.Eq. 233; Rorer and Pierce cite only Bailey. Neither the Bailey case nor the Elkins case support any statement of implied participation. In Bailey v. Hannibal & St. Joseph R. Co., C.C.Mo.1871, Fed.Cas.No.736, 1 Dill. 174, affirmed 1873, 17 Wall. 96, 84 U.S. 96, 21 L.Ed. 611, the preferred stock was expressly made participating by the very terms of the contract; the question involved was whether it should participate immediately after receiving its stated dividend, or only after the common had "caught up" by receiving a dividend equal to the preference ("delayed participation"). The court ruled in favor of "delayed" participation. The text writers have confused situations where the contract *speaks* on the subject with those where it is silent. Pierce apparently refers to "delayed" participation as "the plan usually adopted." Wood and Rorer seem to be stating the facts of the Bailey case without expressly saying so, and without referring to its contract terms. In the case of Elkins v. Camden & A. R. Co., 1882, 36 N.J.Eq. 233, the question was whether preferred dividends were cumulative under the terms of that particular corporate charter. Victor Morawetz, the eminent authority who was instrumental in the present reorganization, in writing on "Private Corporations" in 1886, discussed preferred stock and its nature generally and indicated that its rights depended on the contract; but, so far as we can see, he gave no indication of a presumed or implied participation. He knew of the Bailey case, cited by certain text writers, and cited it himself, but not as establishing an implied right of participation. There were no adjudicated cases, cited or uncited, which at the time supported the general statements of participation made in certain of those texts.

Counsel also cite numerous corporate texts, law review articles, and financial treatises written after (some long after) 1891, as supporting a theory of presumed participation; this, for their bearing upon the prior "understanding." It will be wholly impossible to discuss all of these, or even any substantial part of them. Among these are: Cook on Stock & Stockholders (1894), § 269; Conynton, Manual of Corporate Organization (1905), p. 73; Harrison, Manual of New York Corporation Law (1906), pp. 75–76; Cooper, Financing an Enterprise (1907), Vol. 2, p. 573; Lough, Corporation Finance (1909), p. 72; 2 Clark & Marshall, Private Corporations (1901), § 417c; Machen, Modern Law of Corporations (1908), § 555; Bogen, Analysis of Railroad Securities (1928), pp. 385–386; Couse, Law of

**257**

Private Corporations in Ohio (1914), p. 762; Kirshman, Principles of Investment (1924), p. 123; Stock, Corporation Finance and Investments (1932), p. 194; 27 Mich.Law Review 731 (1929); 7 Rocky Mt.L.Rev. 69 (1934). The preferred stockholders here state that " * * * beginning sometime after 1910 a divergence developed as to the proper legal presumption applicable to the grant of a dividend preference * * *," but that they cite and quote from these subsequent writers to show the "persistency" of a well-established concept as of 1891. One of the first of these post-1891 texts was Cook (3d Ed.1894); then for the first time, after two prior editions, he states at § 269, p. 365, that "It seems that unless the contract expressly provides otherwise, preferred stockholders participate in the surplus profits remaining after the proper dividend has been declared on the preferred and an equal dividend on the common stock." He cites as authority his own subsequent sections dealing with the cumulation of dividends in the absence of specific provisions, but gives no real citation of authority for the proposition thus somewhat cautiously advanced. Cook, in 1898 (4th Ed., § 269, p. 527) repeated this statement but set out two forms for preferred stock certificates, one making the stock *expressly* participating, the other *expressly* nonparticipating. It would seem that he was somewhat doubtful of the existence of any controlling presumption. In 1903 Cook, after the decision in Scott v. Baltimore & O. R. Co., 93 Md. 475, 49 A. 327 (to be discussed later), cites that case as opposed to his view, but states, in part, in a footnote (Vol. I, 5th Ed., pp. 589–590): " * * * Theoretically it is difficult to justify this conclusion, but practically it is true that the investing public assume and understand that preferred stock is, never entitled to more than its specified and fixed dividends, even though the certificate is silent as to further dividends, * * *". Among the other texts cited, Elliott (1897), Vol. I, § 84, casually indicates a right of participation unless the

contrary is provided, citing only the Bailey case and Allen v. Londonderry, etc., Ry. Co., 25 W.R. 524 (1877); Conyngton (1917 Ed. at § 66) makes a similar statement, citing only Cook (1893), § 269, and Machen on Corporations, § 555; Machen (1908), Vol. I, § 555, recognizes that this poses "a serious question," discusses and questions Scott, but cites only the old English case of Alexandra Palace Co., 21 Ch.D. 149, 157, in support of a presumed participation; Machen then advances the novel theory that the common should receive as much as the preferred has received "over the whole period since the issue," whether the preferred is cumulative or not, to establish equality. We mention this merely to illustrate the complicating views of some text writers on "equality." We fail to see that either the Allen case or the Alexandra Palace case has any real bearing upon the right of participation where the contract is silent. In Clark & Marshall (1907), Vol. 2, § 529b, pp. 1640-1641 (also cited), it is stated: "Preferred stockholders may, *by the terms of the contract,* be entitled, after payment of the preferred dividend, to share equally with the common stockholders in any further dividends that may be declared, or to share in any surplus after payment of a specified dividend on the common stock." (Italics ours.) The law review articles, pro and con, consist chiefly of reviews of adjudicated cases, most of which will be mentioned later. As of 1891 there were perhaps three text writers who had advanced a supposed theory of participation in the absence of provisions to the contrary; but when analyzed, these statements seem actually to constitute recitals or summaries from one or more cases where participation was expressly conferred, and certainly none of them cite any authority actually sustaining that view. These were followed by others after 1891, advocating the view to a greater or lesser extent, but still largely upon theory, and, for some years, without the support of adjudicated authority. For a rather pertinent analysis of the texts see Cornell Law Quarterly,

Vol. XI (1925–26), p. 235. (We shall mention, later, cases which have upheld the theory, and their dates.) While counsel admit a change in the state of the law after the turn of the century, we fail to find any expression or indication of what constituted the change or when it ocurred. As we read the adjudicated cases, to be discussed next, the majority view has always been opposed to a presumed right of participation. We wholly fail to find any such state of the law or any legally substantiated "general understanding" existing in 1891 which would afford the basis for an implied or presumed intent that the preferred stock should participate in surplus earnings, in the absence of an expression upon that subject.

At this point we note the case of Murphy v. Richardson Dry Goods Co., Banc, 1930, 326 Mo. 1, 31 S.W.2d 72, 74, relied on in principle by the common stockholders, and discussed pro and con. It involved the right of preferred stockholders to participate in the surplus to be distributed upon a voluntary liquidation, and also to cumulative dividends. These stockholders had been paid the par value of their stock. There had been no dividends on the common stock for ten years. The preferred there advanced the argument of the inherent equality of all capital stock. The contract provided that upon a distribution of assets the preferred stock should " * * * be first paid in full before any of said assets are applied to any of the common stock." The court held that the preferred stockholders had been paid in full when they received the par value, and that they were entitled to no further participation. Judge Walker dissented in a separate opinion. The facts and the contract there were so divergent from ours that we deem the case to be of no particular authority here. No other Missouri case is even remotely in point.

■ Referring further to the contract itself, counsel argue that the preferred stock was in all respects on an equality with the common because the Articles of Incorporation merely authorized 365,000 shares of "capital stock"; that thereafter, by resolution and consent, the 200,000 shares of preferred stock were "carved out" of the total and endowed with an additional right (the preferential dividend). And, continuing, they suggest that this method of procedure indicated an intent to accord to the preferred stock all the rights of the common, except as expressly negated. Inherently, preferred stock does differ from common stock in dividend rights, and the two classes can never be entirely equal. The delayed participation theory is not an expression of any real equality, but of a created method to permit a delayed "catching up." And a true equality could never be attained here by the method suggested, for the preferred stock had received 64¼% in aggregate dividends during a period of 57 years, while the common received nothing. It seems that at the time of this reorganization it was rather common to create preferred stock by resolution, after the filing of the Articles. Perhaps the statute, § 2558, authorizing the issuance of preferred by resolution, had created some doubt as to whether it had superseded the common law, so that the incorporators thought it best to resolve the doubt and create the stock by resolution. Be that as it may, the preferred stock had long since been created, in actuality, by the plan of reorganization and by the full acceptance of that plan, which had been consummated prior to the actual incorporation. We do not find the mere form or manner in which the preferred stock was thus authorized to be controlling. Nor would the incorporators, as mere agents of the depositing security holders, be authorized to add to or detract from the rights of any class by selecting a mode of procedure.

We doubt that those who deposited securities under the plan had any inkling of an "understanding" of participation by the preferred stock. We are not impressed with the argument of "unfairness" to the old second mortgage bondholders, supposed-

ly arising from the fact that they relinquished 6% bonds and received a 5% preferred stock, par for par. They also received, pro rata, new second mortgage bonds for cash assessments paid, and a preference in dividends in a reorganized company. This was a voluntary plan of reorganization, not one dictated by a court where stricter rules of compensation might prevail. There was a necessary balancing of the equities among all the complicated and conflicting interests. Six million seven hundred thousand dollars of old second mortgage bonds had been sold to the Gould Syndicate for approximately 30 cents on the dollar. It is also obvious that the holders of the preferred stock immediately acquired thereby the voting control of the reorganized company, a consideration which was probably highly material. It is a little late for the old second mortgage bondholders to complain after 60 years that they were then unfairly treated if participation is not now to be allowed. That question will have to be decided upon the principles and law otherwise applicable. We hold that the contract grants no right of participation to the preferred stock, either by a fair construction of its terms, or by implication from any claimed "understanding" of the times.

To an opinion already too long we must now add some reference to the decided cases,—to see whether they establish a doctrine of presumed participation. The common stock cites as containing dictum opposed to such a doctrine, and as the only applicable case decided before 1891, the English case of Birch v. Cropper, 14 App. Cas. 525 (House of Lords, 1889). When we consider also the unreported decision of the Court of Appeal, the case does, by its dictum, seem to refute the theory of presumed participation. It is not, of course, controlling here in any sense. The first case of substance was that of Scott v. Baltimore & O. R. Co., 1901, 93 Md. 475, 49 A. 327. Therein Mr. Morawetz, one of the authors of the present reorganization, was counsel for certain voting trustees, and other eminent lawyers of the time participated. There, as here, the preferred stockholders contended that all the capital stock was on a strict equality except as expressly restricted, and that the preferred should participate, by way of dividends, in all surplus earnings. Some of the facts there make the case particularly applicable; there had been a reorganization and an exchange of old securities for new, consummated in 1899. The contract there provided that the preferred stock should receive dividends "up to, but not exceeding four per centum before any dividends shall be set apart or paid upon the common stock." The preferred there was also expressly made noncumulative. There was no applicable statute. Many of the same arguments were made there as are made here, including a reliance upon the text writers for a presumed participation. The court held unanimously that the preferred stock could not participate in any dividends beyond its stated 4% per year. Referring to the argument for a presumed participation, the court said (93 Md. loc. cit. 501, 49 A. loc. cit. 329): " * * * When it is borne in mind that the problem before them involved the adjustment upon just and equitable principles of the various, and doubtless conflicting interests of many persons, the complicated and multifarious relations of the properties of other companies. and the combination of all these varied interests in one harmonious plan, it is difficult to conceive how in one of its most important features. there should have been left anything to construction. * * * " Then, following a reference to the texts, and noting that no decided case authority had been found, the court said further (93 Md. loc. cit. 502–503, 49 A. loc. cit. 329): "So that there is no room here for the argument that in declaring the rights of the preferred stock it was not necessary to state particularly that it should have such attributes, because of the reason that under well settled principles of law it is entitled *proprio vigore* to such participation. * * * where the proposition of law has not been definitely settled

but lies in the mind of each person as he may reason out the matter for himself, it would be most unreasonable to assume that when the schedule for the issue of $40,000,000 of preferred stock was included in the plan, everything was not then put there that the parties intended should be there. * * * As to the common stock, it was not necessary that its characteristics should be stated, for they were definitely fixed by law. But it was supremely necessary in reference to the preferred stock, to make such description of it as would clearly inform its holders of just what rights would attach to its ownership. * * *" The court thus disposed of the present theory of a "general understanding" and a presumption of participation as of the 1890's. Proceeding then to a construction of the contract, the court stated that, upon the theory advanced by the preferred stock (namely, that the phrase quoted above merely limited the *preference* and not the entire rights of the stock) the words "not exceeding" in the stock certificate (also contained in our common stock certificate) would be mere surplusage, whereas the fair meaning of those words is (93 Md. loc. cit. 506, 49 A. loc. cit. 331): " * * * that the preferred stock should be non-cumulative and should receive four per cent and no more, out of the net earnings; but should be entitled to receive that before any dividends are set apart for the common stockholders." The court also held that the omission of the words "and no more" was not material under the circumstances of that case. On this latter phase see particularly Tennant v. Epstein, 356 Ill. 26, 189 N.E. 864, 98 A.L.R. 1515; see, also, Johnson v. Johnson & Briggs, Inc., 138 Va. 487, 122 S.E. 100.

It is contended here that the ruling in Scott that there was no implied participation from a "general understanding" of the times was dictum, because the court actually construed the contract as nonparticipating. We are inclined to the view that the court adopted two alternative and equally determinative grounds of decision and that neither was dictum. But, be that as it may, the opinion on the question of the supposed "general understanding" is highly presuasive; if for no other reason, this is true because the case is the one closest in point of time to 1891, and because most eminent counsel of the 1890's were very seriously concerned in it.

The doubtful foundation of the whole theory of presumed participation is shown by the fact that the preferred stockholders in Scott were not sure in their own minds as to what type of participation they were entitled to, and therefore made alternative claims, (a) "immediate," i. e., to share equally in all dividends after *they* received 4%; and (b) "delayed," i. e., to share equally in all dividends after the *common* was paid a like 4%. And see, similarly, Stone v. United States Envelope Co., 119 Me. 394, 111 A. 536, 13 A.L.R. 422. We do not consider the omission of the words "up to" (as contained in Scott) before the words "not exceeding" (in the present common stock certificate) as controlling or particularly significant. Before leaving this case, we cannot refrain from noting that Mr. Morawetz, in his brief as printed in the Maryland reports, stated (93 Md., loc. cit. 496, supra) that: " * * * It is inconceivable that the parties drafting the plan of reorganization and the stock certificates should have left these questions open if they had intended that the holders of the preferred stock should in any event receive dividends in excess of four *per centum per annum.*" Apparently, he felt so strongly on this matter that he abandoned the neutral position ordinarily espoused by trustees.

Counsel for the common stockholders also cite: Niles v. Ludlow Valve Mfg. Co., D.C.S.D.N.Y.1912, 196 F. 994, affirmed 2 Cir., 1913, 202 F. 141; Hatch v. Newark Tel. Co., 1930, 34 Ohio App. 361, 170 N.E. 371, appeal dismissed 1930, 122 Ohio St. 611, 174 N.E. 12; Stone v. United States Envelope Co., 1920, 119 Me. 394, 111 A. 536; Tennant v. Epstein, 1934, 356 Ill. 26, 189 N.E. 864; Shimmon v. National

Screw & Tack Co., 1916, 18 Ohio N.P., N.S., 569; Powers Foundry Co. v. Miller, 1934, 166 Md. 590, 171 A. 842; Will v. United Lankat Plantations Co., Ltd., (1912), 2 Ch. 571, 107 L.T.,N.S., 360, affirmed 109 L.T.,N.S., 754 (1913); Duwelius v. Champion Fibre Co., Ohio Com.Pl.1924, 25 Ohio N.P.,N.S., 107, motion to certify record overruled 1924, 22 Ohio Law Rep. 600; Keith v. Carbon Steel Co. (W.D.Pa., 1917, unreported).

Contra, counsel for the preferred stockholders cite, among other cases: Sternbergh v. Brock, 1909, 225 Pa. 279, 74 A. 166, 24 L.R.A.,N.S., 1078; Fidelity Trust Co. v. Lehigh Valley R. Co., 1906, 215 Pa. 610, 64 A. 829; Sterling v. H. F. Watson Co., 1913, 241 Pa. 105, 88 A. 297; Englander v. Osborne, 1918, 261 Pa. 366, 104 A. 614, 6 A.L.R. 800; Star Publishing Co. v. Ball, 1922, 192 Ind. 158, 134 N.E. 285; Coggeshall v. Georgia Land & Investment Co., 1914, 14 Ga.App. 637, 82 S.E. 156; Lyman v. Southern R. Co., 1928, 149 Va. 274, 141 S.E. 240. We have designated the above cases as those deserving mention, among the many authorities cited pro and con. It will obviously be impossible to discuss these individual cases in any detail. As stated by counsel for the preferred stock, in seeking to distinguish the first group of cases cited above, the wording of various contracts referred to differs from ours. To some extent this is true, of course; in some, the distinctions are not at all material. Those cases as a group, and on their particular facts, renounce the theory of an implied or presumed participation in surplus earnings by a preferred stock to which no right of participation has expressly been granted, and hold that the common is entitled to all surplus earnings to be distributed after payment of the fixed dividend on the preferred. These decisions range in date from 1912 to substantially the present time; and some of these cases involved corporate contracts made in the 1890's. They come from several different jurisdictions. Generally, they proceed upon the following logic: that the common stock

takes the greater risk in times of adversity, often getting nothing (as here for 56 or 57 years), whereas the preferred, with a dividend promised from the first earnings, certainly takes a lesser risk; that, to compensate the common stockholders for their greater risk, and in return for preferred's preferential consideration, the courts consider that the preferred stockholders have agreed not to participate in surplus earnings; that common stock would be highly unpopular unless it had some compensating benefits; that there is no general understanding among investors that a preferred stock shall be participating; and that a contract providing for a preferred stock with a fixed preferential dividend (and no statement regarding participating rights) should be considered as fixing the whole of the rights of the preferred to dividend distributions, with nothing to be added by implication. Some regard the "participation" theory as an attempt to add something to the contract which its framers never thought of.

The Pennsylvania cases cited by the preferred stockholders adopt, without equivocation, the theory that the preferred stock should be participating unless the contrary is expressed. The first case, Fidelity Trust Co. v. Lehigh Valley R. Co., 1906, 215 Pa. 610, 64 A. 829, announced the rule with no citation of authority whatever (case or text). The next case (Sternbergh, 74 A. 166, opinion by the same Judge) cited only four texts and the Fidelity case. The next two (Sterling, 88 A. 297, and Englander, 104 A. 614) cite only the prior Pennsylvania cases, and 10 Cyc. 573. These opinions contain little or no discussion of the real problem. A somewhat reticent Pennsylvania Federal Court felt impelled to reject the Pennsylvania view in Keith v. Carbon Steel Co., an unreported decision of the District Court for the Western District (April 30, 1917). The case of Star Publishing Co. v. Ball, 192 Ind. 158, 134 N.E. 285, 288, is also relied on. There the preferred stock was expressly made participating "pro rata" after dividends of 5%

had been paid on the preferred and the common. The question arose upon an attempted redemption of the preferred. A statute limited preferred dividends to 8% "before any dividend shall be * * * paid on the common stock." The court held that the statute should be construed so as to permit participation beyond the 8%; the actual decision means little here when we note the express contract provision for participation, although the court did, perhaps unnecessarily, express the view that the "preferred stock holder * * * is entitled to all the rights of the common stock holder, except as modified by statute and contract." A statement quoted by counsel from the opinion in Coggeshall v. Georgia Land & Inv. Co., 14 Ga.App. 637, 82 S.E. 156, 157, namely: "* * * unless the contract expressly provides otherwise, preferred stockholders participate in the surplus profits, after the preferred dividend had been declared on the preferred stock, and an equal dividend on the common stock," could only constitute the purest of dictum, for the only issue there stated was whether a certain certificate constituted a preferred share or an indebtedness. No authority whatever was cited, except generally as to preferred stock, 1 Cook on Corporation (6th Ed.) 731 et seq. In Lyman v. Southern R. Co., 1928, 149 Va. 274, 141 S.E. 240, 242, also relied on by the preferred stockholders, the court held that the preferred stock was not entitled to participate because of language which gave the directors the power to declare and pay dividends on "any other stock" from any surplus of profits remaining after the stated preferred dividend had been paid; the court construed this as a mandate to pay to the common stock any and all dividends declared out of such surplus. In view of this ruling, and also the emphasis placed by the court upon construing the precise terms of the contract,[3] the generalizations

of the appellate court on the equality of all capital stock in the absence of restrictions (although fully adopting the trial court's opinion which did not go so far) can hardly be regarded as necessary to the decision. And, in construing the contract and in arriving at an intent precluding participation, the court noted that in 1894 the incorporators, no doubt, never contemplated that the corporation would earn such profits "as it is now earning." The trial court's opinion cited and discussed, apparently with approval, several of the cases here relied on by the common stockholders, including the prior Virginia case of Johnson v. Johnson & Briggs, Inc., 138 Va. 487, 122 S.E. 100, which certainly contains language opposed to any implied participation. When fully analyzed the case is no real authority for participation here. In recent well-recognized corporate texts it is indicated that the view of a presumed participation in surplus by preferred stockholders (i. e., in the absence of express provision) is definitely a minority view. Ballantine on Corporations (1946), § 216, pp. 506–507; Fletcher Cyclopedia of Corporations (1957), Rev. Vol. 12, § 5448, pp. 263–266. From our independent examination of the authorities we agree.

■■ It has been impossible for us to discuss specifically all of the contentions included in the briefs. They have all been considered. We are convinced that the corporate contract does not, by a fair construction of its terms, grant to the preferred stockholders the participation which they claim; no such intent is apparent, nor does any "general understanding" of the time create the right by implication. We might well hold that the terms of the common stock certificate stating that the preferred shall receive "in each year dividends (non-cumulative) not exceeding five per cent * * *," being a component part

3. The trial court, whose opinion was adopted, said in part: "* * * It may be that in some cases the failure to make any provision as to participating in excess dividends would naturally be construed as granting such participation, while in other cases the failure to make such provision would be held as a denial of participation. * * *"

of the contract and contemporaneous with the other documents, expressed an intent of nonparticipation beyond 5%. See the Scott and Hatch cases, supra. We prefer to hold, however, that the contract is silent. And we adopt what we deem to be the majority view, supra, to the effect that the common law does not create, in any such case, a presumed right of participation, but, rather, denies it. We prefer that view, both on the weight of decided authority and on logic. It necessarily follows: that the provision for preferred dividends as contained in the corporate contract was a full statement of the dividend rights of the preferred stock, and not a mere statement of its "preference"; that, under the law as it stood both in 1891 and since, the corporate contract permits of no further participation in earnings by the preferred stock in any year after it has been paid its stated dividend of 5%; and that the declaration of a dividend of 1% on the preferred stock, made in November, 1951, is in contravention of the contract and therefore void. We so hold.

The judgment and decree herein is reversed, and the cause is remanded with directions to enter a judgment in accordance with the views expressed in this opinion.

HOLLINGSWORTH, C. J., HYDE, J., STONE, Sp. J., LEEDY and DALTON, JJ., concur.

WESTHUES, J., dissents.

WESTHUES, Judge (dissenting).

I cannot concur in the result reached in this case by the opinion of Judge EAGER whose opinion we shall hereafter refer to as "the opinion." As stated in the opinion, "The sole question involved here is whether the preferred stockholders of plaintiff are entitled to participate with common stockholders in dividends after the preferred stock has received the stated 5% preferential dividend in any given year, and the common has received a like dividend."

In the opinion, after a full history of the reorganization of the St. Louis, Arkansas and Texas Railway Company of Texas and the St. Louis, Arkansas and Texas Railway Company of Arkansas and Missouri which culminated in the organization of the St. Louis Southwestern Railway Company (referred to as the "Cotton Belt"), it is stated that the certificates of stock, preferred and common, correctly reflected the agreement and understanding of the parties in the reorganization negotiations.

The preferred stock certificates, in reference to dividends, read: "The holders of the preferred stock are entitled in each year to receive dividends at the rate of five per cent per annum, payable out of the net profits of the Company before any dividends shall be declared or paid on the common stock for such year, but if in any year dividends amounting to five per cent shall not be declared payable on the preferred stock, the holders shall not thereafter receive any further dividends for said year, the dividends on the preferred stock not being cumulative."

The certificates of the common stock provided that: "The common stock of the Company is subject to the right of the holders of the preferred stock to receive in each year dividends (non-cumulative) not exceeding five per cent before any dividend shall be declared or paid for that year on the common stock."

Section 2558, RSMo 1889, in force in 1891, read in part: " * * * and it is also further provided, that when a dividend of ten per cent per annum shall have been declared upon the preferred stock of any company, issued in pursuance of this section, then all other dividends shall be declared and distributed *pro rata until* the dividends on the common stock shall equal the dividends on the preferred stock, among all the stockholders of such corporation;

* * *." (Emphasis ours to word "until.")

The preferred stockholders say that Section 2558, RSMo 1889, governs this case. They further claim that the intent of the parties in view of the times when the stock was issued was that the preferred stock should be participating; that preferred stock was legally presumed to have participating rights. The common stockholders contend the exact contrary, that is, that Section 2558, supra, does not apply; that it appears from the 1891 reorganization that preferred stock should have no dividend rights beyond the 5% and that at the time of reorganization, the opinion and understanding of investors and persons dealing with railroad finances was that unless expressly so provided preferred stock was not participating.

In the opinion, the question of what the "general understanding" was at the time of the reorganization is considered at length (beginning at page 14 and concluding on page 29, 318 S.W.2d 255 to 263). The conclusion reached is not that the "general understanding" was that preferred stock should be non-participating but that the weight of authority held it should not participate unless expressly so stated in the contract. In reaching the conclusion that the weight of authority was on the side of the common stockholders, the writer of the opinion removed the opinions of a number of text writers on the subject from the scales on the side of the preferred stockholders. This is done on the theory that the authorities cited to the text did not support the authors and that they were written prior to 1891. If the authors expressed an opinion on the subject, it should be given at least some weight. "General understandings" do not come into being suddenly but come into existence gradually through the years so the fact that the texts were written before 1891 added weight to the theory that preferred stock should participate.

At the conclusion of the consideration of this subject, it is stated in the opinion that "We might well hold that the terms of the common stock certificate stating that the preferred shall receive 'in each year dividends (non-cumulative) not exceeding five per cent * * *,' being a component part of the contract and contemporaneous with the other documents, expressed an intent of non-participation beyond 5%." In the first place, the quoted portion from the stock certificate is not complete. It reads that the preferred shall receive "in each year dividends (non-cumulative) not exceeding five per cent before any dividend shall be declared or paid for that year on the common stock." That there was no general understanding on the question in 1891 is obvious. The fact that fourteen pages of the opinion are devoted to determining what side of the question had the weight of authority refutes the contention that there was a general understanding.

Furthermore, the parties directly concerned, that is, the stockholders and the board of directors, were uncertain what the status of the stockholders was concerning dividend rights. Had the board been of the opinion that the preferred stock was not entitled to any dividend exceeding 5% in any one year, it would, no doubt, have ordered the excess dividend to be paid to the common stockholders.

The writer of this dissent was the author of the opinion written in Division One which was concurred in by all of the judges of that division. After reading and considering the opinion of Judge EAGER, I am more convinced than ever that Section 2558, supra, is applicable. The following is taken from the opinion in Division One (wherein there is some repetition of what this writer has stated supra) which in my opinion should be our ruling. Note what was said:

"It is the contention of the preferred stockholders, whom we shall hereafter call

respondents, that Sec. 2558, supra, governs this case; that the preferred stock was issued in pursuance of that section and that it is controlling. Further, they contend that apart from the statute, the intent of the parties in view of the times when the stock was issued, was that the preferred stock should be participating stock; that even if there is no evidence as to intent of the parties, preferred stock is legally presumed to have participating rights.

"The contention of the common stockholders, to whom we shall hereafter refer as appellants, is that Sec. 2558, supra, does not confer any rights upon the preferred stock; that the case must be decided upon the terms of the contract; that it clearly appears that the intention of the parties to the 1891 reorganization was that the preferred stock should have no dividend rights beyond the 5% mentioned in the stock certificate. They further contend that, at the time of reorganization, the opinion and understanding of the investors and persons dealing with railroad finances was that preferred stock, unless otherwise expressly provided for, did not participate beyond the specified dividend in any one year.

"The trial court heard evidence upon all of those questions and in a memorandum opinion held that 'The Court is of the opinion that a reasonable construction of Section 2558 Revised Statutes Missouri, 1889, in the light of its legislative history, would make it applicable to a railroad company preferred stock issued while it was in force and providing a preference up to 10%, and render such stock participating after a dividend equal to the preference had been declared on the common stock. Necessarily, then, it would have that effect on the preferred stock of the St. Louis Southwestern Railway Company. Aside from said statute, the Court is further of the opinion that a reasonable construction of the documents and interpretation of the circumstances relating to the reorganization of the St. Louis, Arkansas & Texas Railway Company and the issuance of the St. Louis Southwestern Railway Company's preferred stock, in the light of the legal and lay opinions of that time, would also render such stock participating.

" 'Consequently, the preferred stockholders of the St. Louis Southwestern Railway Company are entitled to participate with the common stockholders in the dividend declared on November 26, 1951.'

"Appellants say that the trial court was in error in holding that a reasonable construction of the documents and of the circumstances relating to the reorganization in the light of the legal and lay opinions of that time would render the preferred stock participating. Respondents contend that the trial court was correct in so ruling. Both sides briefed this question at length. Each side introduced evidence on the subject. The view we have taken of this case renders unnecessary a determination of that question. We may say in passing that the trial court's view is supported by good authority.

"It is our opinion that the above-quoted portions taken from the certificates of stock and the statute, Sec. 2558, supra, are controlling. It is admitted that the recitation in the certificates of stock correctly reflect and are in harmony with the resolutions and proceedings in pursuance of which the stock certificates were issued. The provisions of these certificates as to dividends are plain, specific, and unambiguous. The provision in the preferred stock certificate provides that the holders of such stock are entitled to dividends of 5% each year before the common stockholders are to receive any dividend. The other quoted portion from the preferred stock certificate provides that the dividends shall not be cumulative. This provision has no bearing on the question to be decided in this lawsuit.

"The provision above-quoted from the common stock certificate simply provides that the common stock is subject to the right of the preferred stockholders to be

paid in each year dividends not exceeding 5% before such common stockholders shall receive any dividend. No provision was made concerning what was to be done in case the preferred and common stockholders each had received a 5% dividend in any one year and the Cotton Belt would in the same year declare a dividend in excess of 5% on all stock. It is at this point that the statute governs the situation. Sec. 2558, supra, was a special statute prescribing the conditions under which preferred stock could be issued by any railroad company organized under the laws of this state. An examination of the reorganization proceedings taken by the Cotton Belt for the issuance of the preferred stock shows that the provisions of the statute, Sec. 2558, supra, were followed. It is evident that the persons controlling the reorganization were well aware of the statute and therefore knew of its provisions as to dividends. Appellants argue that the trial court was in error in construing the statute and that the statute limits rather than adds to the dividend rights of the preferred stockholders. In their brief, appellants quote from and cite the following cases on statutory construction:

" ' "The legislative intent in the enactment of the law is to be sought and effectuated." O'Malley v. Continental Life Ins. Co. [1934], 335 Mo. 1115, 1119, 75 S.W.2d 837, 839.

" ' "In construing a statute the legislative intent must be kept in mind, if it may be ascertained, and the whole act or portions thereof as are in pari materia, should be construed together." Holder v. Elms Hotel Co. [1936], 338 Mo. 857, 862, 92 S.W.2d 620, 622, 104 A.L.R. 339.' "

"Appellants also further argue that in construing Sec. 2558 we must keep in mind that there was a change in the attitude of the general public and law making bodies toward railroads after its predecessor was first enacted in 1871. See Laws 1871, p. 53. They say that the attitude at that time (in 1871) was liberal as evidenced by the provisions of the statute permitting preferred stock to be issued on a vote of 'a majority in interest of all the votes cast' by the stockholders. The Constitution adopted in 1875, Art. XII, Sec. 10, provided that preferred stock could not be issued without the approval of all stockholders. Sec. 780 of the 1879 statutes was amended and became Sec. 2558, supra, of the 1889 statutes. Among the amendments was one changing the provision authorizing the issuance of preferred stock. The statute was amended to conform to the Constitution and required a favorable vote of all stockholders authorizing preferred stock. So, it is apparent that the trend of legislation, as stated by appellants, from about 1873 and for some years thereafter, was to place restrictions and limitations on the issuance of preferred stock by railroad companies. When the section, later to become 2558, was first enacted, the provisions quoted supra, read the same, with one exception, as they did in the Revisions of 1879 and 1889 and revisions thereafter. In 1939, Sec. 2558 became Sec. 5149 and it was repealed in 1945 when a new section was enacted in lieu thereof.[1] See Laws 1945, p. 686.

"In the Revision of 1889, the word 'until,' which we italicized in the quotation above, was substituted for the word 'after' so that the statute as originally enacted read 'then all other dividends shall be declared and distributed pro rata after the dividends on the common stock shall equal the dividends on the preferred stock, among all the stockholders of such corporation; * * *.'

"We cannot agree with appellants' contention that the statute may not in any event be applied in this case because it is restrictive and does not give preferred stockholders any rights. If that had been the intention of the legislature, a simple provision to the effect that the preferred

---

1. Now V.A.M.S. § 388.220.

stockholders could not be paid in any one year a dividend in excess of 10% would have been sufficient. The statute is restrictive in the sense that the preferred stock may not earn in excess of 10% per year unless the common stockholders are likewise paid such a dividend. In this case, the plan of reorganization provided that no more than 5% should be received by the preferred stockholders unless the common stockholders should also receive such a dividend. In that sense, the statute is restrictive. But we cannot ignore the provision 'then all other dividends shall be declared and distributed *pro rata.*' It is our opinion that the statute does apply to the present situation.

"It is the further contention of appellants that the legislature, when it amended the statute, intended to substitute the word 'until' for the word 'after' and that this court must construe the meaning of the statute as thus written. Respondents contend that it is evident from the wording of the statute that the word 'until' was substituted for the word 'after' through some mistake and that this court should interpret the statute as though the word 'after' were in the statute as it was originally enacted. All parties are in agreement that if the statute be construed as written, then the common stockholders could in no event receive a dividend equal to that of the preferred stockholders. Note what is said in one of appellants' briefs: 'If after a ten per cent dividend ·was declared upon the preferred stock all other dividends were distributed pro rata among all the stockholders, obviously the common never could catch up with the ten per cent paid on the preferred.' If we read the pertinent portion of the statute and omit the word 'until,' it says 'and it is also· further provided, that when a dividend of ten per cent per annum shall have been declared upon the preferred stock of any company, * * then all other dividends shall be declared and distributed *pro rata* * * * among all the stockholders of such corporation; * * *.' So reading the statute, it plainly

says that all dividends in any one year in excess of the dividends specified shall be distributed among all stockholders. If we employ the word 'until' as the statute reads, nothing is added or taken from that provision providing for distribution of the dividends in excess of that to which the preferred stock is entitled. If, however, we use the word 'after' then the clause has a definite meaning, that is, that after the preferred stockholders have been paid their specified dividend, then such holders shall not receive any further dividends unless the common stockholders have also received a dividend equal to that paid the preferred. Such a construction is favorable to the common stockholders. We cannot, as they want, ignore the statute nor can we legally eliminate the statute.

"In thus construing the statute, we have followed well established rules of construction. One of the prime rules of construction is that courts must construe a statute so as to ascertain and give effect to the intention of the legislative body enacting the law. 82 C.J.S. [Statutes] § 321 [p. 560.] Having ascertained the intention of the legislature, verbal inaccuracies may be corrected. Note the general rule stated in 82 C.J.S. [Statutes] § 342 [pp. 685–687:] 'Generally, mere verbal inaccuracies, or clerical errors or misprints will be corrected by the court, in the construction of a statute, whenever necessary to carry out the intention of the legislature as gathered from the entire act. Accordingly, the court may disregard or rectify errors or mistakes in statutes in the use of words, numbers, grammar, punctuation, or spelling, in order to give effect to the intent of the legislature. In other words, if the legislative intent is clear, it must be given effect regardless of inaccuracies of language. So words may be modified or altered so as to give the statute the effect intended by the legislature, and where one word has been erroneously used for another, and the context affords the means of correction, the proper word will be deemed substituted; * * *.' Note also what is said in 82

C.J.S. [Statutes] § 329 [pp. 651, 652]: 'The words and phrases employed in a statute should be given a reasonable and sensible construction to carry out, if possible, the intention of the legislature. The statutory words should be construed so as to give them some meaning and the statute some force and effect. Uncertain or ambiguous words will be construed so as, if possible, to produce a reasonable result in harmony with the purpose of the act.' The general rules above-stated are supported by cases from Missouri. State ex rel. Dean v. Daues, 321 Mo. 1126, 14 S.W.2d 990, 1[oc.] c[it.] 1001, 1002 (6–8); Consolidated School Dists. v. Hackmann, 302 Mo. 558, 258 S.W. 1011; Hayes v. Hayes, 363 Mo. 583, 252 S.W.2d 323, 1[oc.] c[it.] 327(2); Kidd v. Puritana Cereal Food Co., 145 Mo.App. 502, 122 S.W. 784, 1[oc.] c[it.] 788. We are of the opinion that the trial court correctly ruled the question."

I should like to point out wherein the ruling in Judge EAGER'S opinion may result in a gross injustice to preferred stockholders. Let us keep in mind that the preferred stock in this case is non-cumulative, meaning that if no dividend is paid in any one year, no dividend shall be declared thereafter for that year for the benefit of the preferred stock. Suppose, for example, that the common stockholders of a railroad corporation, through the board of directors, have control of the financial affairs of the company. The preferred stock is, as in this case, non-cumulative. The board then could declare a dividend, say, every 10 years, of 40%; the preferred stock would receive 5% and no more and the common stock 35%. Here is where I think the statute is a protection to the preferred stockholders. If we applied the statute, the preferred stock would receive 5%, the common stock would then be paid 5% and the statute says when that has been done, "then all other dividends shall be declared and distributed *pro rata* * *, among all the stockholders of such corporation; * * *." Under the ruling of the opinion of Judge EAGER, it is certainly a misnomer to call the preferred stock "preferred." In fact, the common stock would be the preferred. It is said that the authority to issue preferred stock is for the purpose of tempting investors to help finance the building and improving of railroads. As said in Judge EAGER'S opinion, "The issuance of railroad preferred stock was sometimes regarded as a sort of 'hybrid' method of raising capital, somewhere between mortgage bonds (with their burdensome fixed charges) and common stock (which had apparently not been very attractive)." A buyer of such preferred stock may have at the time thought he was purchasing a Georgia peach when in reality under the ruling of Judge EAGER'S opinion, he received a green persimmon.

The opinion, in considering Section 2558, supra, states, "As we construe it, it is only applicable where (as stated) 'a dividend of ten per cent per annum' has been declared upon the preferred stock; * * *." So construing the statute would lead to an absurdity. I do not believe that the legislature intended such a limited application of the statute. It would mean that had the parties in the organization of the "Cotton Belt" provided that the preferred stock be paid a 10% dividend instead of a 5% dividend, then the statute would apply. I agree that then the preferred stock providing for a 10% dividend would be in reality preferred. Does that make good sense? I think not. I desire to add a quotation from an opinion adopted by this court en banc in the case of State v. Kollenborn, Mo.Sup., 304 S.W.2d 855, 864, bottom of page 864: "What is not good sense should not be the law."

I respectfully dissent.